**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-2904
_____

UNITED STATES OF AMERICA

v.

MATTHEW KOLODESH,
a/k/a Matvei Kolodech,
a/k/a Michael Kolodech,

          Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-11-cr-00464-001)
District Judge:  Hon. Eduardo C. Robreno
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
April 24, 2015

Before:  CHAGARES, JORDAN, and BARRY,
<u>Circuit Judges</u>

(Filed: May 28, 2015)

Gary Green, Esq.
Sidkoff, Pincus & Green
1101 Market Street
Suite 2700
Philadelphia, PA 19107

Jack J. McMahon, Jr., Esq.
1500 Walnut Street
Suite 1100
Philadelphia, PA 19102
        *Counsel for Appellant*

Zane David Memeger, Esq.
Robert A. Zauzmer, Esq.
Emily McKillip, Esq.
Office of the United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106
        *Counsel for Appellee*

_____

OPINION OF THE COURT

_____

JORDAN, Circuit Judge

Matthew Kolodesh appeals from his conviction and sentence following a trial in the United States District Court for the Eastern District of Pennsylvania based on his involvement in a Medicare fraud scheme. We will affirm.

## I.   **Background**[1]

Kolodesh owned a home-health services company called Community Home Health, Inc. Around 1999, he approached one of his employees, Alex Pugman, with the idea of starting a company to provide home-based hospice care. Pugman, who had a background in hospice care, agreed. Kolodesh funded the new company, which they named Home Care Hospice, Inc., and Pugman managed the day-to-day operations. Kolodesh's wife, Malvina Yakobashvili, and Pugman were listed as owning equal shares in the company; however, Kolodesh was intimately involved in forming and overseeing the management of Home Care Hospice.

As early as 2000 or 2001, Kolodesh, Pugman, and Pugman's wife, Svetlana Ganetsky, who was also employed

---

[1] The following general background information is supplemented by additional facts as they relate to each argument raised on appeal. Because Kolodesh was convicted after a jury trial, "we must defer to the jury's verdict and view the evidence in the light most favorable to the government. Therefore, we recount the government's version of the facts." *United States v. Serafini*, 233 F.3d 758, 763 n.4 (3d Cir. 2000) (citation omitted).

by Home Care Hospice, began giving gifts and cash "kickbacks" to doctors in exchange for patient referrals. (App. at 979-82.)  In addition, at Kolodesh's suggestion, Pugman placed some doctors or their employees on the Home Care Hospice payroll with sham job titles.  Those sham employees were then issued paychecks, in exchange for patient referrals.

About 90% of the revenue generated by Home Care Hospice came from Medicare reimbursements.  Medicare, as is well known, is a federal health benefits program providing financial assistance to senior and disabled citizens to cover medical costs.  *Fischer v. United States*, 529 U.S. 667, 671 (2000).  "Medicare attains its objectives through an elaborate funding structure," *id.* at 673, one aspect of which involves reimbursement to health care providers for medical treatment costs incurred in furnishing services to Medicare recipients, *id.* at 677, 680.  Providers are reimbursed by the Centers for Medicare and Medicaid Services ("CMS") through a "fiscal intermediary," which is a private entity that contracts with CMS to help it administer the Medicare program by determining payment amounts and making payments.  42 U.S.C. §§ 1395h(a), 1395kk-1(a); 42 C.F.R. § 405.902; *see also Fischer*, 529 U.S. at 677.

At some point, Home Care Hospice began to submit to CMS fraudulent claims for reimbursement.  Medicare provides reimbursement only for hospice patients certified as terminally ill and places time limits on the validity of such certifications, 42 C.F.R. §§ 418.21-.22, but, at Kolodesh's suggestion, Home Care Hospice began submitting reimbursement claims for patients who did not qualify for hospice care.  Kolodesh and Pugman had the employees of

4

Home Care Hospice falsify patient records to conceal the fraud. Home Care Hospice employees also falsified records to show patients as eligible for and receiving continuous care – a more time-intensive and thus more expensive level of care – when those patients were neither eligible for nor received such care.

To surreptitiously extract value from Home Care Hospice, Kolodesh and Pugman would, among other things, have contractors, such as Alexy Drobot, the person who serviced the copy machine for the business, submit fake invoices that Home Care Hospice would pay, and then the contractor would give most of the money to Kolodesh and Pugman, while keeping a portion for himself.

Kolodesh, Pugman, Ganetsky, and a number of others were charged for their roles in the scheme to defraud Medicare. Kolodesh in particular was charged with one count of conspiracy to defraud a health care benefit program, in violation of 18 U.S.C. § 1349, twenty-one counts of health-care fraud, in violation of 18 U.S.C. § 1347, two counts of mail fraud, in violation of 18 U.S.C. § 1341, and eleven counts of money laundering, in violation of 18 U.S.C. § 1957. At the conclusion of a five-week trial, in which Pugman and Ganetsky testified for the government after having pled guilty, the jury convicted Kolodesh on all counts. Kolodesh filed a motion for a new trial and, later, a supplemental motion for a new trial, both of which the District Court denied. On May 28, 2014, the District Court sentenced him to a total of 176 months' imprisonment, with three years of supervised release. The Court also ordered restitution in the amount of $16.2 million. Kolodesh filed this timely appeal.

## II.    Discussion[2]

The arguments on appeal focus on allegations of prosecutorial misconduct, certain evidentiary issues, and supposed errors in responding to a request from the jury and in sentencing.[3]  We address each in turn.

---

[2] The District Court had original jurisdiction under 18 U.S.C. § 3231; we have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

[3] In support of the arguments raised in his opening brief, Kolodesh raises several new contentions in his reply brief.  Those are waived and we do not address them further. *See United States v. Pelullo*, 399 F.3d 197, 222 (3d Cir. 2005) ("It is well settled that an appellant's failure to identify or argue an issue in his opening brief constitutes waiver of that issue on appeal.").

6

## A.   Prosecutorial Misconduct[4]

Kolodesh argues that the government committed prosecutorial misconduct in two ways.  First, he says the prosecutor improperly introduced and repeatedly referred to an inaccurately transcribed, irrelevant, and unduly prejudicial portion of a recorded conversation between Kolodesh and Pugman.  Second, he says the prosecutor improperly elicited testimony about Russian stereotypes, which undermined the fairness of the trial.

### 1.   *Transcript of Wiretapped Conversations*

At trial, the government relied heavily on transcripts of conversations that had been recorded through wiretaps that the FBI placed at Home Care Hospice.  One such

---

[4] Kolodesh did not lodge a contemporaneous objection to the prosecutor's conduct; rather, he raised the issue for the first time in his motion for a new trial.  We therefore review the District Court proceedings for plain error insofar as this argument is concerned.  *United States v. Brennan*, 326 F.3d 176, 188 (3d Cir. 2003).  Under that standard, "an appellate court may, in its discretion, correct an error not raised at trial only where the appellant demonstrates that (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Marcus*, 560 U.S. 258, 262 (2010) (internal quotation marks omitted) (alteration in original).

conversation between Kolodesh and Pugman related to a letter that a Medicare fiscal intermediary, Cahaba Government Benefit Administrators, LLC ("Cahaba"), sent to Home Care Hospice. The letter requested patient data for the 2006-2007 fiscal year to determine whether Home Care Hospice's claims had exceeded the cap for new patients, the cap being a limit on the total annual amount CMS would reimburse for each hospice patient. The letter requested the number of new patients admitted during a defined period, but, depending on how the letter was interpreted, the period could be understood to be twelve or thirteen months. Knowing that they had overbilled Medicare, Kolodesh and Pugman decided to submit thirteen months of data and to misrepresent several patients as new when they had been previously discharged but since readmitted. During the recorded conversation, Kolodesh said to Pugman, "We have to f*** them over this time, one more time and be smart about it … ." (App. at 1261.) The government referred to this comment twice in its opening statement and four times in its closing argument. Kolodesh did not object to any of those references.[5]

Calling his remark the "F*** Medicare Statement," Kolodesh now argues that the translation and transcription of it, which was originally in Russian, was inaccurate. (Opening Br. at 19.) He also says that the government should have told the jury that the statement did not appear in the original transcription of the conversation. According to Kolodesh, the failure to get a good translation and the failure to tell the jury that his F*** Medicare Statement appeared only in the later

_____

[5] Kolodesh did object to questions to Pugman about what Kolodesh meant, but not to the admissibility of the statement itself or the government's use of that statement.

8

transcription constitute prosecutorial misconduct. He seems to forget, however, that he stipulated at trial to the truth and accuracy of the transcripts. He thus invited any error and cannot complain now. *United States v. Stewart*, 185 F.3d 112, 127 (3d Cir. 1999) (limiting plain-error review to errors that were not invited); *see also United States v. Console*, 13 F.3d 641, 660 (3d Cir. 1993) ("A defendant cannot complain on appeal of alleged errors invited or induced by himself, particularly where, as here, it is not clear that the defendant was prejudiced thereby." (internal quotation marks omitted)).

Kolodesh also argues that the government's reliance on the F*** Medicare Statement constitutes misconduct because it was irrelevant to the crimes charged in the indictment. On the contrary, though, his crude and concise comment was directly relevant to the twenty-one counts of health care fraud. It helped establish the fraudulent nature of the claims his company submitted and his mental state in causing those submissions.

The statement was also relevant to the charged conspiracy. Among the overt acts supporting that charge, the indictment listed the obstruction of a Medicare audit in early 2007. That 2007 audit was separate from the later inquiry by Cahaba that prompted the F*** Medicare Statement during the recorded conversation. In February 2007, Cahaba sent Home Care Hospice a letter notifying it that Cahaba would conduct a prepayment audit for twenty to forty claims covering a portion of the 2005-2006 fiscal year. Kolodesh directed Pugman to bring one of their field nurses into the office and pay her specifically to assist in changing patient records so that they would appear to be compliant. As a result, the audit led to the denial of only two claims out of

9

twenty.  Kolodesh's statement, "'We have to f*** them over this time, *one more time* and be smart about it …'" (App. at 1261 (emphasis added)), is relevant to establishing the fraudulent nature of Home Care Hospice's response to the 2007 audit, as well as being relevant to Kolodesh's corresponding mental state and to the existence of an agreement to defraud Medicare.  Thus, the District Court did not plainly err in permitting Kolodesh's own words to be admitted against him and allowing the government to refer to them freely.[6]

## 2.    *Russian Stereotype Testimony*

Kolodesh argues that the government committed prosecutorial misconduct by repeatedly eliciting testimony from witnesses that Russians "game the system," which

---

[6] Kolodesh also makes reference to Rules 403 and 404(a) of the Federal Rules of Evidence.  Any argument based on improper character evidence under Rule 404(a) is waived due to the cursory nature of the reference to it in the brief.  *See United States v. Hoffecker*, 530 F.3d 137, 162 (3d Cir. 2008) (noting parenthetically that "[a]n issue is waived unless a party raises it in its opening brief, and for those purposes a passing reference to an issue will not suffice to bring that issue before this court"); *see also* Fed. R. App. P. 28(a)(8).  Kolodesh's Rule 403 argument – that the inflammatory nature of the single instance of profanity rendered the comment unfairly prejudicial – fails, particularly in light of its probative value.  *Cf. United States v. Pirani*, 406 F.3d 543, 555 (8th Cir. 2005) (en banc) (concluding that tape recording where defendant was "swearing expressively" was not unfairly prejudicial).

10

testimony the government then used to "assert to the jury that Kolodesh must be guilty because … [he] was born in Russia."[7] (Opening Br. at 37.) He misstates the record. First, the prosecutors did not elicit a majority of the statements of which Kolodesh complains; rather, those references to Russians were offered by witnesses without any prompting by the government.[8] And statements that arguably were elicited by the prosecutors are relatively innocuous in the context of this case. The nurses at Home Care Hospice

---

[7] Kolodesh was originally from the Georgian Soviet Socialist Republic, but he casts his argument on appeal broadly to include not only "Russian ethnic stereotypes" but also stereotypes about "native Russians," "Russian speakers," and, more generically, the "Russian community" in the United States, with which Kolodesh was identified at trial. (Opening Br. at 37, 38.)

[8] For example, one of the prosecutors engaged in the following exchange with Pugman:

Q   Are you familiar with the concept of a continuous care schedule?
A   Yes.
Q   What is that?
A   So, if Irina as coordinator on Russian team would come to me and by that time, let's say, in the year 2007-2008, especially nurses on the Russian team, they loved continuous care. Continuous care meant a lot of money, of course, some work in terms of documenting, but then getting paid for this.

(App. at 1016-17.)

were divided into a "Russian team" and an "English team," with each team focusing on patients who spoke those respective languages. (App. at 956-58.) When asked which team was involved with most of the fraudulent claims, Pugman stated matter-of-factly that it was the Russian team, without elaborating on the reasons. When Ganetsky was asked whether any nurses refused to participate in the fraud, she responded, "None of the Russian nurses had a problem with fabricating charts." (App. at 2531.) But she immediately followed with the statement that, "[o]n the English team, there was a nurse who refused to participate," making it clear that participation in the fraudulent scheme did not break down strictly along ethnic, linguistic, or cultural lines.[9] (*Id.*; *see also id.* at 1031-32 (Pugman testifying that "a couple of nurses" refused to participate, without specifying which team, and stating by way of illustration that if he approached a nurse on the English team who refused, he would simply approach another nurse on the English team and offer to pay her double to do it).) In another instance cited by Kolodesh, Pugman stated that Kolodesh told him "how the marketing is done in [the] Russian community." (App. at 963.) When the prosecutor asked for further details, Pugman recounted Kolodesh's explanation of how he would provide doctors cash kickbacks for referrals. Yet that testimony must be considered in the context of other evidence, such as Pugman's testimony that both "Russian" and "American" doctors received kickbacks for giving referrals, though the former preferred cash kickbacks while

---

[9] If the fraudulent activity had broken cleanly on such lines, that would be a matter of fact, not bias. That it did not do so simply reduces any force in the argument that there was a risk that the jury would succumb to prejudice.

the latter preferred to be placed on the payroll.[10]   (App. at 1214.)

The government did not invoke Russian stereotypes in its opening statement or closing argument to the jury.  The only references to ethnicity or language groups came in closing argument and involved a reference to how each group of doctors – Russian speakers and English-only speakers – preferred to receive kickbacks and a reference to a statement by Ganetsky that she believed the co-conspirators would be suspected of fraud because they were Russians.  The prosecutor used the latter statement not to prove that Russians were predisposed toward fraudulent activity, but to suggest that Ganetsky, Pugman, and Kolodesh believed that Home Care Hospice was about to come under closer scrutiny, and that their subsequent efforts to discharge large numbers of inappropriate patients indicated knowledge of the fraudulent nature of their actions.  Thus, the government did not, as Kolodesh alleges, "broadcast" Russian stereotypes to the jury. (Opening Br. at 40.)  Viewed in the context of the evidence presented at trial, the prosecutors' questions and statements do not constitute misconduct, nor was it plain error for the District Court to permit them.[11]

---

[10] The final statement Kolodesh cites that was actually elicited by the prosecutors was Kolodesh's own comment that he is "savvy … like all Russians." (App. at 1121.)  But the context of Kolodesh's statement indicates that he was referring to why he prefers the cash-basis accounting method to the accrual-basis method; he was not referring to fraudulent activity.

[11] Kolodesh further argues that testimony concerning Russians was inappropriate because none of the witnesses

## B.    Evidentiary Issues[12]

Next, Kolodesh alleges a series of evidentiary errors; namely, the District Court's exclusion of allegedly exculpatory medical evidence, its failure both to exclude evidence of uncharged wrongful acts and to allow Kolodesh to rebut that evidence, and its admission of conversations relating to his attempt to open an overseas bank account.

---

were qualified "as expert witnesses on the propensity of Russian people to commit crimes." (Opening Br. at 39.) That argument is frivolous. When Ganetsky attempted to testify as to how business was conducted at "other Russian agencies," Kolodesh objected and that objection was sustained. (App. at 2532.) Otherwise, the testimony Kolodesh cites all involved witnesses explaining the facts of this case based on personal knowledge. *See* Fed. R. Evid. 701 (stating that opinion testimony of a lay witness is permitted if, among other things, it is "rationally based on the witness's perception"). Kolodesh also mentions a litany of other evidentiary rules that were supposedly violated by admitting testimony that he says involved Russian stereotypes. Those arguments are not meaningfully briefed and are thus waived. Fed. R. App. P. 28(a)(8); *Hoffecker*, 530 F.3d at 162.

[12] "Generally, we review evidentiary rulings for abuse of discretion, but when no objection is made at trial we review for plain error only." *United States v. Brink*, 39 F.3d 419, 425 (3d Cir. 1994) (citation omitted).

### 1. Exclusion of Evidence of Medical Condition

Kolodesh argues that the District Court abused its discretion by preventing him from countering Pugman's testimony that Kolodesh met him at the office almost daily. Kolodesh says he had evidence that he was homebound due to illness from 2003 to 2005. He contends that, because the illegal activity began in earnest in 2003, the excluded evidence would have provided "exculpatory alibi testimony" showing that he "was physically too ill to be involved in the operation of [Home Care Hospice]" at that time. (Opening Br. at 42.) If the Court erred in this respect – and it appears it did – the error was harmless.

Kolodesh called his wife, Yakobashvili, as a witness and attempted to have her testify as to his health. The District Court ruled that Yakobashvili had personal knowledge to testify as to "whether he got up in the morning and went or left the house," but testimony that illness was the reason he could not go to work would be hearsay. (App. at 4275.) When Yakobashvili repeatedly ignored the scope of defense counsel's questions and testified not only that Kolodesh was "[n]ot really" going into work at Community Home Health, but that the reason was that he was "very sick," the District Court cut off questioning and ordered defense counsel to move on. (App. at 4276.)

"Testimony that conveys a witness's personal knowledge about a matter is not hearsay." *United States v. Vosburgh*, 602 F.3d 512, 539 n.27 (3d Cir. 2010). The proffered testimony could be understood to establish that Yakobashvili had personal knowledge that her husband was

15

ill in some way and that the illness had an effect on his ability to work. That testimony could certainly have been subjected to close scrutiny under cross-examination, but her impressions of her husband's health and capacity to work were not hearsay.[13] However, even if Kolodesh had been allowed to pursue that line of questioning, it would not have affected the outcome of the trial. We are quite sure of that. *See United States v. Zehrbach*, 47 F.3d 1252, 1265 (3d Cir. 1995) (en banc) (stating that an error is harmless "when it is highly probable that the error did not contribute to the judgment," which "requires that the court possess a sure conviction that the error did not prejudice the defendant" (emphasis and internal quotation marks omitted)).

Kolodesh wanted Yakobashvili to testify as to his health between 2003 and 2005. The incriminating evidence that Kolodesh identifies as being undermined by such testimony, however, refers to Kolodesh's almost-daily office visits with Pugman *during 2000 and 2006*. Elsewhere, Pugman testified that he and Kolodesh had "always" been in "communication" on a daily basis, including in 2003 (App. at 1051), and that some of their conversations took place over the phone. Furthermore, Pugman testified that, starting sometime in 2004, he and Kolodesh began having meetings after business hours in Kolodesh's home, though "rarely" in Pugman's home because Kolodesh "was more comfortable" in his own house. (App. at 967.) While Pugman also testified that he and Kolodesh "[s]ometimes, [but] not that often," met

---

[13] Yakobashvili's attempt to identify the particular illness that her husband had may be another matter. But the District Court could have limited that testimony without excluding all reference to Kolodesh's health.

at Community Home Health during 2004 (App. at 968), that testimony comports with Yakobashvili's testimony that in 2004 – in the midst of the period that she testified her husband was ill – Kolodesh had a meeting with Pugman, Ganetsky, and Yakobashvili at Community Home Health.[14] Because Yakobashvili's proffered testimony did not demonstrate that Kolodesh was not involved in the operation of Home Care Hospice during 2003 to 2005, it failed to contradict Pugman's testimony or to materially weaken his credibility. The decision to exclude Yakobashvili's testimony about Kolodesh's illness was, therefore, harmless.

### 2. Other-Acts Evidence Regarding Community Home Health

Kolodesh argues that the District Court erred in not *sua sponte* excluding testimony by Pugman and Ganetsky that employees at Community Home Health engaged in certain uncharged acts of fraud. Pugman testified that he learned how to fraudulently alter charts in preparation for an audit while working at Community Home Health. He said that the director of nursing would instruct him to "fix[]" the charts, but if, for example, he refused to come in on the weekend to do so when he had other plans, he would get a call from Kolodesh urging him to come in and help. (App. at 1047.)

---

[14] Kolodesh also claims that Pugman testified that Kolodesh "regularly came to [Home Care Hospice] to review the books." (Opening Br. at 41.) But what Pugman actually said is that Kolodesh came to Home Care Hospice to review the company's books "[o]n [an] as-needed basis." (App. at 978.) Furthermore, Pugman provided no timeframe for that statement.

Similarly, Ganetsky testified that, when she was working at Community Home Health, Kolodesh instructed her "on several occasions" to fabricate records for his mother-in-law, indicating that she received services that were, in fact, never provided.[15]   (App. at 2605.)   Ganetsky also testified that Kolodesh told Pugman that he had "several ghost employees" on the payroll at Community Home Health, and that the same kind of fraud should be undertaken at Home Care Hospice. (App. at 2507.)

Evidence of uncharged acts is admissible if the following requirements are met:  "First, the evidence must be offered for a proper purpose under Rule 404(b)[ of the Federal Rules of Evidence]; second, the evidence must be relevant under Rule 402; and third, the probative value of the evidence must outweigh its potential for unfair prejudice under Rule 403."  *United States v. Ciavarella*, 716 F.3d 705,

---

[15] Kolodesh further complains of testimony that, on behalf of Home Care Hospice, Ganetsky entered into unlawful kickback arrangements with Community Home Health staff.  That testimony, though, refers to illegal actions that are part of the crimes charged – the indictment specifically mentions the kickback scheme as a method of enrolling inappropriate hospice patients in Home Care Hospice.   Such testimony does not, therefore, relate to evidence of uncharged wrongs, and, even if it did, it would be intrinsic to the charged offense.  *United States v. Gibbs*, 190 F.3d 188, 217 (3d Cir. 1999) ("Rule 404(b), which proscribes the admission of evidence of other crimes when offered to prove bad character, does not apply to evidence of uncharged offenses committed by a defendant when those acts are intrinsic to the proof of the charged offense.").

18

728 (3d Cir. 2013). The District Court did not plainly err in admitting the testimony of Pugman's and Ganetsky's experiences at Community Home Health. The testimony was not offered as evidence of Kolodesh's character as a defrauder in order to show that he acted in accordance with that character at Home Care Hospice. *See* Fed. R. Evid. 404(b)(1). Rather, it was offered as circumstantial evidence of Kolodesh's knowledge of the fraudulent activity at Home Care Hospice. In his opening statement, defense counsel asserted that Kolodesh was unaware of the fraudulent practices at Home Care Hospice, and that the scheme was concocted and executed by Ganetsky and Pugman. Counsel asserted that, in contrast, Kolodesh ran Community Home Health as a legal, legitimate business. In light of the defense theory of the case, the relevance of the government's evidence is clear: Kolodesh knew what fraudulent practices looked like – indeed, he taught them to Pugman and Ganetsky – and if Kolodesh was as intimately involved in Home Care Hospice as Pugman testified, he certainly would have known of the fraudulent conduct. Given the relevance of the complained-of evidence, we cannot say it was unfairly prejudicial, especially when seen through the lens of plain-error review.

Kolodesh also argues that he should have been allowed to rebut that evidence by offering testimony about how he operated Community Home Health after Pugman left that company in 2001. At trial, Kolodesh sought to call three witnesses who worked at Community Home Health to counter the government's evidence that he had instructed employees to fabricate records. The District Court allowed him to call the witnesses but limited their testimony to events "up to 2001," when Pugman left to work full time at Home

19

Care Hospice, because the government's evidence had been similarly limited. (App. at 4111.) The Court stated, however, that it would revisit its ruling if Kolodesh could demonstrate that the government's evidence relative to Community Home Health went beyond 2001. Defense counsel responded that Ganetsky testified about her experience at Community Home Health up until about 2003 or 2004 , but he agreed to put on his witnesses and limit their testimony to 2001 and earlier, and then bring the witnesses back later "if [he felt] it's that essential to bring them back."[16] (App. at 4114.) The witnesses then testified that, during the 1999-2001 time period, Kolodesh never instructed them to fabricate records. Defense counsel also followed up with the first of the three witnesses in a way that extended the testimony beyond 2001:

> Q  And that was the whole time that you worked there, right?
> A  Yes.
> Q  And you still work there now, right?
> A  Yes.

(App. at 4141.) The government did not object, though it objected to a similarly broad question posed to the second witness.

---

[16] Defense counsel also added, "[I]n reality, I don't think it makes a whole lot of difference." (App. at 4114.) However, it is unclear whether that statement was a concession as to the value of additional testimony or a reference to the logistical matter of whether to put witnesses on then or after having had an opportunity to review Pugman's and Ganetsky's testimony.

The District Court acted well within its discretion by allowing Kolodesh to rebut the government's evidence while partially limiting the temporal scope of the testimony. To prevent the trial about fraudulent practices at Home Care Hospice from devolving into a side trial about fraudulent practices at Community Home Health, the Court's ruling was entirely reasonable. But, even if we were to conclude that the District Court abused its discretion, its ruling was harmless. Kolodesh's witnesses testified that he never asked them to doctor any charts, and one witness testified to that fact well beyond the 2001 limit. We are fully persuaded that the admission of additional testimony about Kolodesh's practices at Community Home Health after 2001 would not have affected the outcome of the case. *See Zehrbach*, 47 F.3d at 1265 (setting forth test for harmless error).

### 3. Relevance of Conversations Regarding Overseas Bank Accounts

The final evidentiary challenge Kolodesh advances is to the relevance and prejudicial effect of extensive recorded conversations that referred to his opening a Swiss bank account. Kolodesh argues that evidence of foreign investments is "generally inadmissible" because of the negative perception in the public's mind linking such accounts to criminal activity. (Opening Br. at 47.) Yet the case Kolodesh cites for that proposition does not support it. Rather, the case simply applied the standard rules relating to relevance and unfair prejudice, with the result being the approval of admission of evidence of a secret Swiss bank account. *United States v. Friedland*, 660 F.2d 919, 929 (3d Cir. 1981); *cf. United States v. Udeozor*, 515 F.3d 260, 264-65 (4th Cir. 2008) ("Rule 403 is a rule of inclusion, generally

21

favoring admissibility … ." (brackets and internal quotation marks omitted)).  Here, Pugman testified that he, Ganetsky, and Kolodesh discussed the possibility of moving money overseas "to protect our money … from the government," after they had received a letter from Cahaba requiring Home Care Hospice to repay over $2.6 million in reimbursements that had exceeded the per-patient cap for the 2006-2007 fiscal year.  (App. at 1280.)  Although Cahaba retracted the letter and at trial the government conceded that the letter was prompted by "a bookkeeping error" (App. at 4399), which Home Care Hospice corrected, the government argued – and the testimony supports – that the letter prompted Kolodesh and his co-conspirators to discharge several patients and discuss the possibility of moving money overseas because they were aware of fraudulent activity that would be detected if Cahaba continued to scrutinize Home Care Hospice.  In one of the recorded conversations, Kolodesh indicated that he wanted to put money in a Swiss bank account, but he wanted to avoid one particular bank because "[it] reports everything to the American government."  (App. at 1284.)

The recorded conversations were thus relevant as circumstantial evidence of Kolodesh's knowledge that his actions were fraudulent and that he risked losing his money as a result.  They were also relevant as circumstantial evidence of knowledge regarding the money laundering charges.  Although the discussions about possibly putting money into Swiss accounts was not part of those charged offenses, the conversations provided evidence of Kolodesh's intent to maintain access to criminally derived property and conceal such transactions from the government.  The mere possibility of a negative inference regarding Swiss bank accounts did not

22

substantially outweigh the probative value of the recordings. Thus, the District Court did not plainly err in admitting them.

### C.  Response to Jury's Request[17]

Kolodesh argues that the District Court erred in failing to provide the jury with transcripts of testimony that the jury requested and, further, in failing to suspend jury deliberations until those transcripts could be provided. After the jury began deliberating, it sent a note asking for a transcript of Pugman's testimony, "both direct and cross," and noting that, "[i]f possible," the transcript "may be edited to cover only testimony regarding continuous care." (App. at 4611.) The jury requested the same for Ganetsky's testimony and a full transcript for the testimony of Cecilia Wiley, Home Care Hospice's office manager. After obtaining the agreement of counsel, the District Court instructed the jury that it would not be possible to provide only the portions of the transcript relating to continuous care. The Court also noted the length of the full testimony for Pugman and Ganetsky and told the jury it had two options: it could either rely on its recollection of the testimony or "request the entire transcript of Ganetsky and Pugman or either one or both." (App. at 4622.) The Court then sent the jury back to decide what it wanted to do. The record is not entirely clear, but the jury may have sent a note back requesting the full transcript of Pugman's and Wiley's testimonies, though not Ganetsky's. (*See* App. at

---

[17] Because Kolodesh failed to raise a contemporaneous objection, we review for plain error. *United States v. Salahuddin*, 765 F.3d 329, 337 (3d Cir. 2014), *petition for cert. filed*, 83 U.S.L.W. 3558 (U.S. Dec. 2, 2014) (No. 14-654).

23

4623-26 (defense counsel discussing all three witnesses and indicating that the jury had requested Wiley's testimony twice); *id.* at 4630 (District Court stating when jury returned, "I have received your request for the transcripts of Alex Pugman and Cecilia Wiley").) In any event, after discussing the matter further with counsel, the District Court instructed the jury that a transcript of Wiley's testimony was not available but that the jury could rely on its recollection or come back into court and have the audio recording of the testimony played in its entirety. "As to Alex Pugman's transcript," the Court explained, "that is available and it will be delivered to you. It may take a little bit of time because it has to be edited to take the sidebars out of the transcript that has been developed." (App. at 4631.) Before sending the jury back to the jury room, the District Court summarized, "So if possible, continue your deliberation on these and other issues as you wish while the Pugman transcript is being edited, and as far as Wiley is concerned, those are the choices that you have." (*Id.*) Just over two hours later, the jury returned a verdict.

As the foregoing record indicates, the District Court did not fail to make the transcript or recordings available to the jury; it expressly told the jury that it had a choice as to how to proceed regarding the Wiley testimony, that the Pugman transcript would be given as soon as it was available, and that it was free to continue deliberation as it wished.[18]

---

[18] We reject Kolodesh's contention that, by failing to mention Ganetsky's testimony when the jury returned, the District Court tacitly rejected the jury's request for her testimony. As noted above, the jury appears to have withdrawn that request. But even if that reading of the record

24

That the jury ultimately chose to rely on its recollection of the witnesses' testimonies does not indicate that the Court should have halted proceedings. The handling of such matters is within the "broad discretion" of the trial court, *United States v. Bertoli*, 40 F.3d 1384, 1400 (3d Cir. 1994) (internal quotation marks omitted), and how the Court proceeded in this instance was not in any way an abuse of that discretion, let alone a problem rising to the level of plain error.

### D. Sentencing

Finally, Kolodesh challenges the procedural and substantive reasonableness of his sentence, including the District Court's restitution order.

---

is inaccurate, we do not believe the jury would have interpreted the District Court's comments as a reversal of the earlier instruction to the jury that it could rely on its own recollection of Ganetsky's testimony or request a full transcript.

### 1. *Alleged Procedural Error*[19]

First, Kolodesh argues that the government did not establish that the health care fraud in this case resulted in a $16.2 million loss, and, therefore, the twenty-level loss-enhancement imposed under the U.S. Sentencing Guidelines was inappropriate. *See* U.S.S.G. § 2B1.1(b)(1)(K). An agent who worked on the case testified at sentencing that he calculated the loss based on Pugman's and Ganetsky's testimony as to the percentage of continuous care claims that were fraudulent, 90-99.5%, and the percentage of patients who did not qualify even for non-continuous hospice care, 30-33%. Using the lower estimates, the agent multiplied those percentages by the respective dollar amounts of claims submitted between 2003 and 2008, $1.7 million for

---

[19] In *United States v. Flores-Mejia*, 759 F.3d 253 (3d Cir. 2014) (en banc), we concluded that a defendant must object after a sentence is pronounced to preserve a claim based on "failure to give meaningful consideration" to the defendant's objections. *Id.* at 256. That rule, however, does not apply to sentences such as Kolodesh's that were entered before *Flores-Mejia* was decided. *Id.* at 259. Furthermore, Kolodesh does not challenge the adequacy of the District Court's consideration of the objections he raised. He instead challenges the District Court's application of the Sentencing Guidelines, and in particular the Court's factual findings in support of the Guidelines calculations it made. Therefore, our review is for abuse of discretion. *United States v. Wise*, 515 F.3d 207, 217 (3d Cir. 2008). "[A] district court will be held to have abused its discretion if its decision was based on a clearly erroneous factual conclusion or an erroneous legal conclusion." *Id.*

continuous care and $48.9 million for non-continuous care, resulting in a total loss of $16.2 million. Kolodesh argues that Pugman and Ganetsky were not competent to testify as to the percentage of fraudulent claims and that the government provided no foundation for their testimonies. He says that, based on expert testimony he advanced at the sentencing hearing, statistical sampling was needed to establish an accurate estimate of loss in this case.

The District Court did not clearly err in concluding that the government proved a $16.2 million loss. Pugman and Ganetsky each testified extensively at trial regarding their intimate involvement in the management of Home Care Hospice and, together with Kolodesh, their direction of the company's fraudulent activities. It is difficult to imagine who would have been more competent to testify based on personal knowledge as to the loss involved in this case. Furthermore, "[t]here is no rule that a district court must rely upon statistical analysis in a situation such as this to determine the amount of loss pursuant to section 2B1.1." *United States v. Jones*, 641 F.3d 706, 712 (6th Cir. 2011) (making that statement as a general proposition in a health care fraud case, but reversing because the district court relied solely on a flawed statistical analysis). And as the application notes to the Sentencing Guidelines indicate, "[t]he court need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1 app. n.3(C). We find no error in the District Court's application of the loss enhancement.

Next, Kolodesh argues that the District Court erred in applying a four-level enhancement based on his role as an organizer or leader of the fraudulent activity. *See* U.S.S.G. § 3B1.1(a). He points to evidence adduced at trial indicating

27

that he had no control over the fraud and instead was, at most, "a passive, silent partner" in Home Care Hospice. (Opening Br. at 56.) Although he acknowledges the existence of damning testimony by Pugman and Ganetsky, he argues that they were "simply not credible." (Opening Br. at 57.) We decline Kolodesh's invitation to reweigh the evidence or reassess the witnesses' credibility. Pugman and Ganetsky repeatedly testified at trial that Kolodesh was intimately involved in directing the fraudulent scheme. Although the jury could have chosen to reject Pugman's and Ganetsky's testimony and believe Kolodesh's version of events, it did not. The District Court's finding that Kolodesh was an organizer or leader of the fraudulent activity is in line with the jury's verdict, and Kolodesh has pointed to nothing in the record that would make the District Court's finding clearly erroneous. *See United States v. Igbonwa*, 120 F.3d 437, 440-41 (3d Cir. 1997) (stating that under the clearly erroneous standard, the reviewing court does not "conduct a *de novo* review of the evidence" but considers "whether there is enough evidence in the record to support the factual findings of the district court," or, in the context of credibility determinations, whether "the district court's decision is based on testimony that is coherent and plausible, not internally inconsistent and not contradicted by external evidence").

Kolodesh's final procedural challenge relates to the District Court's imposition of a two-level sentencing enhancement for obstruction of justice. *See* U.S.S.G. § 3C1.1. During trial, Alexy Drobot – a witness for the government who, as noted earlier, had contracted with Home Care Hospice to service its copy machine – testified that Kolodesh came to his office shortly before Drobot was

28

scheduled to testify.[20]  Drobot was not there, but Kolodesh had Drobot's secretary call and ask him to meet Kolodesh at Community Home Health.  When Drobot refused, Kolodesh proposed a meeting at Starbucks.  Drobot agreed and they met over coffee for about fifteen minutes.  The only thing they discussed was Drobot's upcoming testimony.  Kolodesh mentioned that Drobot would probably get called as a witness the following week, and Kolodesh said, "don't bury me." (App. at 2977.)  Drobot responded that he would not perjure himself but would "tell the truth and be done with this." (App. at 2978.)  Drobot acknowledged on cross-examination that Kolodesh did not threaten him or ask him to lie or to change his testimony.

Again, Kolodesh is simply rearguing the weight of the evidence, without pointing to anything that shows the District Court clearly erred in finding that he willfully attempted to obstruct or impede the administration of justice.  We conclude, therefore, that the District Court did not commit procedural error in applying the challenged enhancements.

---

[20] Drobot testified at trial about the agreement he had with Kolodesh and Pugman to provide them with fake invoices in return for a portion of the funds used to pay those invoices.

## 2. *Substantive Reasonableness*[21]

Kolodesh challenges the substantive reasonableness of his sentence by arguing that he "did not orchestrate the fraud committed by [Home Care Hospice]" and that he "suffers from several physical and emotional conditions" that will prevent him from committing further crimes and make him an inappropriate candidate for a long term of incarceration. (Opening Br. at 62, 63.) He also says that the imposition of a large sentence and large restitution amount renders the sentence doubly harsh. We have already disposed of Kolodesh's challenge to his role in the fraudulent scheme. *See supra* p. 24. As to Kolodesh's physical condition, the District Court concluded that the Bureau of Prisons was "fully equipped and … well positioned to provide appropriate medical attention to Mr. Kolodesh's ailments." (Supp. App. at 12.) Kolodesh recites his ailments but does nothing to challenge the Court's conclusion or to show why his ailments are so incapacitating that he could not commit any further offenses. Finally, the combination of a lengthy imprisonment term with a large restitution order does not render a sentence unreasonable. *Cf., e.g.*, *United States v. Lewis*, 557 F.3d 601, 613-15 (8th Cir. 2009) (upholding the substantive reasonableness of a sentence of 204 months' imprisonment in a case involving a restitution order of $39 million, although

---

[21] We review the substantive reasonableness of a sentence for abuse of discretion. *Wise*, 515 F.3d at 218. "[I]f the district court's sentence is procedurally sound, we will affirm it unless no reasonable sentencing court would have imposed the same sentence on that particular defendant for the reasons the district court provided." *United States v. Tomko*, 562 F.3d 558, 568 (3d Cir. 2009) (en banc).

the defendant there did not argue that the length of imprisonment and size of restitution combined to render the sentence unreasonable).  Rather, we must "take into account the totality of the circumstances" as we consider the reasonableness of the sentence under the facts of each case. *Gall v. United States*, 552 U.S. 38, 51 (2007).

Under a common understanding of the term, restitution is just what its name denotes: a restoring of victims to their state before the crime, as nearly as possible.[22]  Viewed that way, it is akin to compensatory damages in a civil suit rather than punitive damages.  The Supreme Court, however, has stated that there is a punitive aspect to restitution orders in a criminal case, *see Paroline v. United States*, 134 S. Ct. 1710, 1726 (2014) ("The primary goal of restitution is remedial or compensatory, but it also serves punitive purposes." (citation omitted)), and we are bound to follow that.  Yet even though restitution has been deemed to serve "punitive purposes," its "primary goal" is still "remedial or compensatory," *id.*, and we see no reason why imposing restitution in an amount

[22] *See* Merriam-Webster's Collegiate Dictionary 996 (10th ed. 2002) (defining "restitution" as "1: an act of restoring or a condition of being restored: as a: a restoration of something to its rightful owner b: a making good of or giving an equivalent for some injury 2: a legal action serving to cause restoration of a previous state," defining "restitute" as "1: to restore to a former state or position 2: GIVE BACK; esp: REFUND," and defining "restore" as "1: GIVE BACK, RETURN 2: to put or bring back into existence or use 3: to bring back to or put back into a former or original state: RENEW 4: to put again in possession of something" (emphases omitted)).

31

equal to the loss actually caused by Kolodesh and his co-conspirators would, when coupled with a lengthy term of imprisonment that is otherwise reasonable, render the sentence substantively unreasonable. Moreover, the District Court here granted a downward departure,[23] imposing a sentence of 176 months' imprisonment in the face of a guidelines range of 188 to 235 months. The justifications given for the sentence are reasonable.

### 3. *Restitution*[24]

Kolodesh argues that the government did not adequately prove the amount of loss and that, in any event, the District Court erred by holding him jointly and severally liable for the full amount of loss rather than for the portion he caused. Kolodesh's first argument is answered by our already-stated conclusion regarding the District Court's factual findings on the loss amount. *See supra* pp. 22-23. His second argument is foreclosed by the very language of the statute authorizing restitution, which explicitly provides for joint and several liability in the full amount:

> If the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of

---

[23] The Court granted the downward departure based on its conclusion that the lower sentence "will satisfy the factors under 3553." (Supp. App. at 12.)

[24] "We review the legality of a restitution order de novo and review specific awards for abuse of discretion." *United States v. Turner*, 718 F.3d 226, 235 (3d Cir. 2013).

the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.

18 U.S.C. § 3664(h).

Kolodesh relies on the Supreme Court's recent decision in *Paroline*, but that case cannot serve him in these circumstances. *Paroline* interpreted 18 U.S.C. § 2259, a mandatory restitution statute specific to Chapter 110 of the United States criminal code, which covers sexual exploitation and other abuse of children. 134 S. Ct. at 1716. The opinion was specifically concerned with the application of § 2259 to the crime of possessing child pornography. *Id.* The Supreme Court vacated an en banc decision of the United States Court of Appeals for the Fifth Circuit that had "held that § 2259 did not limit restitution to losses proximately caused by the defendant, and each defendant who possessed the victim's images should be made liable for the victim's entire losses from the trade in her images, even though other offenders played a role in causing those losses." *Id.* at 1718. While the Supreme Court held that "a court applying § 2259 should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses," it explicitly limited that holding to the "special context" at issue in the case. *Id.* at 1727. Regardless of whether the words "special context" refer only to possession-of-child-pornography offenses or, more broadly, to any offense which might involve an "atypical causal process" underlying the victim's losses, *id.* at 1722, no such special context exists here. This case involves straightforward consideration of moneys obtained by fraud.

33

*Paroline* does not alter the long-standing availability of joint-and-several liability in circumstances such as this.[25] The District Court's restitution order is thoroughly sound.

## III. Conclusion

For the foregoing reasons, we will affirm Kolodesh's conviction and sentence.

---

[25] Section 2259, the statute at issue in *Paroline*, incorporates the enforcement procedures of § 3664. *See* 18 U.S.C. § 2259(b)(2) ("An order of restitution under this section shall be issued and enforced in accordance with section 3664 in the same manner as an order under section 3663A[, which governs mandatory restitution to victims of certain crimes]."). As noted above, § 3664 grants the district court discretion to impose joint and several liability or to apportion liability. *Id.* § 3664(h). Again, nothing in *Paroline* suggests that the Court was foreclosing the statutorily authorized imposition of joint and several liability in the typical case.