**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-2683

UNITED STATES OF AMERICA

v.

NATALYA SHVETS,
                    Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(District Court No. 2:12-cr-00112-002)
District Judge: Honorable Eduardo C. Robreno

_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
July 8, 2025

(Filed: September 29, 2025)

Before: SHWARTZ, FREEMAN, AND RENDELL, *Circuit
Judges*.

Natalya Shvets
Brooklyn, NY

*Appellant Pro Se*

Raj Bhargava
Esteban Flores
Zach Spitz
Yale Law School
127 Wall Street
New Haven, CT 06511

Tadhg Dooley
David R. Roth
Wiggin & Dana
One Century Tower
265 Church Street
New Haven, CT 06510

*Court-Appointed Amicus Curiae*

Joseph F. Minni
Robert A. Zauzmer
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106

*Counsel for Appellee*

_____

OPINION OF THE COURT
_____

2

RENDELL, *Circuit Judge*.

In 2014, Appellant Natalya Shvets was sentenced for her role in a conspiracy to defraud Medicare and ordered to pay $253,196 in restitution for the false bills she helped prepare. The Court's judgment provided that Shvets and eight other defendants were "jointly and severally" liable for this amount. But her $253,196 share represented only part of a broader scheme that allegedly caused $16.2 million in loss to Medicare. Two of the defendants held jointly and severally liable with Shvets were ordered to pay for the scheme's entire loss. In total, seventeen individuals associated with the scheme were ordered to pay restitution for varying amounts from $42,211 to $16.2 million. *See* Appendix 1.

Several years later, Shvets moved in the District Court for an accounting and to declare her restitution judgment satisfied based on payments that she and her co-defendants had made. Although Shvets had not personally paid all of the amount ordered by her judgment, she urged that payments by herself and others (with whom she was jointly and severally liable) had totaled more than that amount, so that the judgment was satisfied. After ordering the Government to produce documentation and holding two hearings, the District Court determined that Shvets's restitution judgment had not been satisfied.

The District Court reasoned that Shvets's judgment would not be satisfied until either: (1) Shvets personally paid the entire $253,196 imposed on her (i.e., without counting co-defendants' payments), or (2) Shvets and sixteen co-defendants collectively paid $16.2 million for the entire fraud loss

3

associated with Shvets's employer. Since neither event had occurred, Shvets was still liable to pay. The District Court recognized that the Clerk of Court had been accounting for restitution payments using a different (and more complicated) method of crediting co-defendants' payments. But the District Court determined it did not need to decide whether the Clerk's method was correct because the Clerk, too, was reporting Shvets's restitution balance as outstanding (computing the remaining balance to be $18,929.69), and neither of the two conditions it cited had been satisfied.

On appeal, Shvets urges that the District Court misinterpreted her restitution judgment. She claims her obligation to pay will end as soon as she and the other eight jointly and severally liable co-defendants listed in her judgment collectively pay $253,196, which has already occurred. She further contends that she is not able to understand the Clerk's accounting method from the information provided and that the Clerk's totals do not seem to add up. Shvets also raises various objections to the Government's alleged failure to collect property from co-defendants.

The Government urges in response that Shvets has not shown an error in the Clerk's calculation of her outstanding restitution balance. And the Government maintains there is no additional property belonging to co-defendants that should be credited toward restitution.

We will affirm in part, vacate in part, and remand for the District Court to ascertain how the Clerk has been accounting for restitution payments and whether Shvets's judgment has been satisfied. We will permit sentencing judges to issue hybrid

4

restitution orders under the Mandatory Victim Restitution Act. The MVRA authorizes courts to order restitution based on joint and several liability or based on the defendant's level of contribution to the victim's loss. 18 U.S.C. § 3664(h). The hybrid approach allows judges to combine these approaches, finding them not mutually exclusive. For example, if two defendants, A and B, rob a victim, resulting in a loss of $1,000, and B independently robs the same victim again, resulting in a loss of $500, a sentencing judge may hold A and B jointly and severally liable for the first $1,000, while finding B liable for the $500. As a result, A's and B's restitution debts are hybrid— part joint and several, part apportioned. This hybrid approach provides compensation to the victim and fairness to the parties.

As we discuss below, we find no merit to Shvets's objections regarding the Government's failure to collect property from co-defendants.

## I. Facts

### A. Shvets's Employer's Fraud and Shvets's Role in It

In 2014, a jury convicted Shvets of healthcare fraud and conspiracy to commit healthcare fraud in violation of 18 U.S.C. §§ 1347, 1349, and 2. *United States v. Shvets*, 631 F. App'x 91, 92 (3d Cir. 2015). Shvets's convictions resulted from her employment as a nurse for Home Care Hospice, Inc. (HCH), where evidence at trial showed that Shvets and other HCH employees created false records of providing high-priced "continuous care" (i.e., at least eight hours per day) to patients. *Id.* at 93. Bills for those fictitious services were submitted to Medicare.

5

Other HCH employees (prosecuted in separate proceedings) also defrauded Medicare by falsely documenting patients as terminally ill and thus eligible for hospice care on Medicare's dime. *See United States v. Kolodesh*, 787 F.3d 224, 230 (3d Cir. 2015). Shvets characterizes these as two separate conspiracies: the "continuous care conspiracy" that she was involved in, and the "inappropriate patient conspiracy" regarding hospice eligibility that involved other HCH employees. Appellant Br. 13. The Government, by contrast, views these as different aspects of the same overarching conspiracy to defraud Medicare. Inappropriate hospice billing is mentioned in Shvets's indictment, although it appears undisputed that Shvets's personal involvement was limited to the documentation of fictitious continuous care.

## B. Shvets's and Her Co-Defendants' Sentences

In the judgment of sentence, Shvets was ordered to pay $253,196 in restitution to Medicare for her role in HCH's false billing. The Government's sentencing memorandum described that figure as stemming "from the false continuous care claims arising from the 52 cases in which [Shvets] participated." Appx 125. Shvets's written judgment, following a form used by the Administrative Office of U.S. Courts (AO), described $253,196 as the "Restitution Ordered" and also as the "Total Loss." Appx 66.

Shvets was not the only HCH defendant accused of having been involved with the 52 false bills she helped prepare. For that reason, Shvets's counsel asked the District Court to divide the $253,196 total among the defendants who contributed to it, rather than making Shvets liable for the entire

6

sum. The District Court denied that request. Instead, the District Court ordered Shvets to pay the $253,196 "jointly and severally" with the other defendants who participated in the 52 false bills. Appx 184. Those were Matthew Kolodesh, Alex Pugman, Cecilia Wiley, Giorgi Oqroshidze, Edward Hearn, Alexsandr Koptyakov, Yevgeniya Goltman, and Diana Koltman, although the Government also indicated that "there may be some other individuals as we go forward." Appx 167. Some of those defendants (Kolodesh, Pugman, Wiley, Heart, and Koltman) had been charged in separate indictments and tried in separate proceedings from Shvets. And while some had already been sentenced, others would not be sentenced until later.

Shvets's written judgment, per the AO's form, included a section titled "Joint and Several" listing those eight names along with the $253,196 figure, as follows:

Joint and Several

Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

| | |
|---|---|
| Mathew Kolodesh, CR 11-464, $253,196.00 | Edward Hearn, CR 11-297, $253,196.00 |
| Alex Pugman, CR 09-651, $253,196.00 | Alexsandr Koptyakov, CR 12-112-05, $253,196.00 |
| Ceclia [sic] Wiley, CR 11-322, $253,196.00 | Yevgeniya Goltman, CR 12-112-04, $253,196.00 |
| Giorgi Oqroshidze, CR 12-112-03, $253,196.00 | Diana Koltman, CR 11-182, $253,196.00 |

Appx 67. Although the AO's form indicates that separate figures should be listed for the "Total Amount" and "Joint and Several Amount," these were not provided. *Id.*

7

In all, seventeen individuals, divided across several indictments and docket numbers, were ordered to pay restitution in connection with HCH's fraud. Pugman and Kolodesh (among the defendants listed above as jointly and severally liable with Shvets for $253,196) were held responsible for the total amount, $16.2 million. Each written judgment, like Shvets's, included a list of "Joint and Several" obligors. But those lists were not always consistent across judgments. For example, Shvets's judgment lists Koltman as jointly liable, but Koltman's judgment does not list Shvets. And although Patricia McGill is absent from Shvets's judgment, Shvets does appear in McGill's. One judgment (Zoya Shusterman's) lists Lilia Gorovits as jointly liable for restitution, even though Gorovits's own judgment imposed no restitution but rather a $75,000 fine (not jointly with anyone). Some judgments list dollar figures next to the joint and several defendants and some do not. No judgment lists separate "Total" and "Joint and Several" amounts as specified in the AO form.

After restitution was imposed, the HCH defendants began making payments. By July 2022, Shvets had paid $7,591.88 of the $253,196 she owed. In all, $13.3 million of the total $16.2 million HCH-related loss had been paid. The biggest payments came from Pugman and Kolodesh, the two defendants ordered to pay $16.2 million. By July 2022, they had paid approximately $4 million and $9 million, respectively.

Pugman and Kolodesh paid a significant portion of their $4 million and $9 million through civil settlements in a False Claims Act lawsuit initiated by two *qui tam* relators. *See United States ex rel. Fox v. Home Care Hospice, Inc.*, 06-cv-04679, ECF Nos. 122-4, 122-5 (E.D. Pa. Aug. 24, 2017). These

8

settlements called for Pugman and Kolodesh to turn over cash, bank accounts, and real estate, with amounts received by Medicare (after liquidating assets) to be credited toward restitution.

## C. Shvets's Request for an Accounting

In 2017, HCH defendant McGill challenged her outstanding restitution debt through a motion for an accounting. Shvets (proceeding pro se) joined McGill's request, asserting that the Government's recoveries from the other HCH defendants listed on her judgment should be credited against her own restitution debt and, taken together and properly accounted, had already satisfied it.

The District Court ordered the Government to "provide to the Court a report as to all of the payments made towards the restitution obligations related [to] the Home Care Hospice scheme by all related Defendants." D.C. ECF No. 474. In response, the Government argued "Shvets . . . should not receive restitution credit for the payments made pursuant to [Pugman's and Kolodesh's] civil settlements" and "should be obligated to personally pay the restitution amount that [the District Court] ordered [her] to pay or until Medicare is completely compensated." D.C. ECF No. 485 at 7. According to the Government, since Medicare still had not been paid approximately $3.5 million of what the Government considered to be a total loss of $16.2 million, Shvets's own restitution debt was unsatisfied.

The Government also provided Shvets's outstanding restitution balance as reported by the District Court Clerk's

9

Office, which, by the time of this appeal, was said to be $18,929.69.[1] The Government did not initially explain how the Clerk's number was determined or why the Clerk had apparently afforded Shvets credit for some of the co-defendants' payments despite the Government's urging it should not do so.

Shvets objected to the Government's approach and advanced an alternative theory for when her restitution judgment would be satisfied. Under Shvets's preferred rule, she would be discharged from further payment when she and the eight co-defendants listed in her judgment had collectively paid $253,196. Since two of those co-defendants (Pugman and Kolodesh) had already paid much more than $253,196, Shvets insisted she was not required to pay any more.

Over the next several years, the parties exchanged numerous briefs on the restitution issue, with the Government incrementally divulging additional information about the HCH defendants' payments and the Clerk's accounting system. The District Court then held two hearings. An employee of the Clerk's Office offered testimony as to how the Clerk had calculated Shvets's outstanding restitution balance (summarized below). The District Court also heard argument about how the Government had credited amounts for various properties belonging to Pugman and Kolodesh.

---

[1] Initially, the Clerk reported Shvets's outstanding balance as $124,455.23, but this number was revised several times over the course of the proceedings.

D. Clerk's Accounting System

The record contains limited information on the precise way in which the Clerk accounted for restitution payments by Shvets and her co-defendants. To the extent there are policies governing the way in which the Clerk is to credit amounts in this type of situation, they are not publicly available and have not been made part of the record. Accordingly, we describe the Clerk's methodology as best we understand it.

The HCH defendants had been ordered to pay restitution in amounts ranging from $42,211 to $16.2 million. Adding those amounts together would have produced a total in excess of $30 million. However, the Clerk seems to have concluded that all judgments represented overlapping portions of a total loss of $16.2 million.

The Clerk then appears to have divided the $16.2 million total loss into fifteen "buckets" or "pots," labeled A through O. *See* Appx 316–17, 444–45, 549. The Clerk's documentation suggests that bucket A had a balance of $42,211, bucket B had a balance of $76,669, and bucket C had a balance of $2,687. The bulk of the $16.2 million was placed in bucket O, which had a balance of $15,588,228.62. The total balance of all buckets was $16.2 million.

The Clerk then assigned each of the seventeen HCH defendants to some number of buckets. Shvets was assigned to buckets A through H. The table in Appendix 2, provided by the Clerk, appears to reflect which defendants were assigned to which buckets (except for Svetlana Ganetsky, who was removed after her debt was discharged), although the precise derivation of this table is not in the record. For each defendant,

11

the total of the assigned buckets appears to equal that defendant's restitution judgment. For example, the total of buckets A through H equals Shvets's judgment of $253,196.

The record does not explain why or how the Clerk's system ascertains a total restitution amount, divides it into buckets, and assigns defendants to buckets. There is also no explanation for how the Clerk determined there should be fifteen buckets, what the value of each bucket should be, or which defendant should be assigned to which bucket.

When a payment came in, the Clerk would place its value into some number of buckets. The proportion placed in each bucket was based on the buckets' outstanding balances, although the precise method is not in the record.

Shvets argued that the Clerk was not actually following the allocation method just described. She calculated that her restitution judgment of $253,196 was 1.56% of the $16.2 million total loss figure the Clerk was using, and, thus, she should receive 1.56% credit for co-defendants' payments. But, according to Shvets's calculation, her reported credit was only 0.785% of the payments that had been made thus far. The Government responded (after the hearings) that the percentage might differ from Shvets's expectation because "there is no fixed percentage in the formula" and "[t]he percentage fluctuates because the balance owed for each defendant changes with every payment received by the Clerk." D.C. ECF No. 535 at 14. The record does not appear to contain details or examples that could confirm this.

12

E. Shvets's Other Challenges

Shvets also raised a number of specific challenges to how the Government had accounted for payments from Pugman and Kolodesh.

Shvets argued she should receive a credit for money the Government could have, but did not, collect from Pugman and Kolodesh's bank accounts. In 2008, the Government sought and obtained an injunction under 18 U.S.C. § 1345 prohibiting various individuals from withdrawing funds from bank accounts allegedly connected to HCH's fraud. *See United States v. Home Care Hospice, Inc.*, No. 08-cv-4711, ECF No. 5 (E.D. Pa. Oct. 1, 2008). In its accounting of restitution payments, the Government listed recoveries from some but not all of those bank accounts. Shvets argued the Government should have recovered money from the remaining bank accounts and credited it toward her restitution debt. She made a similar argument about real estate, urging there were real properties associated with Pugman and Kolodesh (or their family businesses) that should have been seized and used to pay restitution.

In an effort to identify other payments that might be credited toward restitution, Shvets sent a subpoena by certified mail to Cahaba Government Benefit Administrators ("Cahaba"), a business that allegedly interfaced between HCH and Medicare. The subpoena sought, among other things, documentation of payments by Cahaba to the United States relating to HCH. When Cahaba did not respond, Shvets asked that the District Court require Cahaba to show cause why it should not be held in contempt. The docket does not reflect that Shvets's motion was ever served on Cahaba.

13

Shvets also raised an issue regarding payments to the relators in the civil False Claims Act lawsuit. The Government's civil settlement with Kolodesh provided for him to make a combination of cash payments and property forfeitures. A share of the proceeds was given to the relators as their incentive payment under 31 U.S.C. § 3730(d). While the entirety of the settlement's cash payments was credited toward Kolodesh's restitution balance (and thus, under the Clerk's system, also partly to Shvets's), the portion of the relators' incentive payments taken out of forfeiture proceeds was not. Shvets objected to this treatment and insisted she should receive a restitution credit for all forfeiture proceeds, including the share given to relators.

## F. The District Court's Ruling

The District Court ruled that Shvets's restitution debt remained outstanding. Relying on *United States v. Sheets*, 814 F.3d 256 (5th Cir. 2016), it reasoned that the HCH defendants would not have satisfied their restitution judgments "until either (a) they have personally paid the amount apportioned to them individually, or (b) the victim has been made whole for the entire harm caused by the comprehensive scheme." *United States v. Novikov*, 624 F. Supp. 3d 550, 558 (E.D. Pa. 2022). The "entire harm," in the District Court's view, was the $16.2 million figure found "[i]n connection with the criminal case against the owner of HCH, Matthew Kolodesh." *Id.* at 553.

The District Court rejected Shvets's objection to importing the $16.2 million figure from another proceeding (i.e., Kolodesh's separately charged prosecution) where she was not a party and had no opportunity to challenge it. The District Court viewed the $16.2 million total as applying to

14

Shvets because her judgment "h[eld] [her] jointly and severally liable with not only the other defendants who committed the same type of conduct, but with Kolodesh and Pugman, who were found to have orchestrated the entire scheme." *Id.* at 557–58.

The District Court recognized that the Clerk had been accounting for restitution in a way that "differ[ed]" from the District Court's own preferred approach, in that it allowed some crediting among co-defendants before the entire $16.2 million balance was paid. *Id.* at 556 n.5. Under the Clerk's accounting, Shvets's outstanding balance was, by then, $18,929.69. *Id.* But because Shvets's balance was still outstanding under either the Clerk's method or *Sheets*'s rule, the District Court determined it did not need to decide whether the Clerk's method was correct. *Id.*

The District Court did not discuss in detail Shvets's challenges regarding bank accounts, real properties, and relator payments, but concluded it was "satisfied that the government has adequately reported all it has recovered toward restitution in this matter." *Id.* at 555. Regarding Shvets's subpoena to Cahaba, the District Court viewed the information sought as only relevant to calculating the harm to Medicare (i.e., the appropriate amount of the restitution judgment), not what credit Shvets might receive for payments after the judgment was imposed. It thus declined to enforce the subpoena.

II. Jurisdiction and Standard of Review

The District Court had jurisdiction over Shvets's criminal case under 18 U.S.C. § 3231. Because Shvets's restitution judgment was an order of the District Court, we

15

agree with the parties that the District Court could exercise subject matter jurisdiction over Shvets's motion to "interpret and enforce" it. *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009). The Government did not raise a procedural objection to Shvets's motion (nor press one on appeal), and we therefore do not consider whether the motion was procedurally proper. *See United States v. Dowdell*, 70 F.4th 134, 146 (3d Cir. 2023).

We have jurisdiction under 28 U.S.C. § 1291 because Shvets's motion was brought after final judgment and the District Court "completely disposed of" it. *Ohntrup v. Firearms Ctr., Inc.*, 802 F.2d 676, 678 (3d Cir. 1986).

"We review legal determinations *de novo*, factual findings for clear error, and matters committed to the District Court's discretion for abuse thereof." *United States v. Doe*, 810 F.3d 132, 142 (3d Cir. 2015). "We must give particular deference to the district court's interpretation of its own order." *In re Fine Paper Antitrust Litig.*, 695 F.2d 494, 498 (3d Cir. 1982).

III. Joint and Several Credits

The parties agree that "a District Court cannot order multiple defendants to pay restitution in amounts that will result in the payment to the victim of an amount greater than the victim's loss." *United States v. Diaz*, 245 F.3d 294, 312 (3d Cir. 2001). They also agree that the HCH defendants' various restitution judgments should be interpreted in such a way as to comply with this rule, and, further, that our task is to apply the judgments as written rather than to reassess what restitution might have been appropriate given the facts of the underlying

crimes. Thus, although neither the judgments themselves nor the relevant statutes expressly provide that co-defendants may receive credit for each other's payments (other than that the judgments state that liability is joint and several), the parties agree that some crediting should be applied to prevent multiple defendants from paying the same debt twice. The parties disagree, however, on the manner in which such credits should be applied.

The task is made more difficult by the fact that the seventeen HCH defendants have overlapping liability that is neither entirely joint nor entirely separate. That is, this is not the simple situation where several defendants who caused a single harm are held jointly and severally liable for all of it. In that situation, a payment by any one defendant might be assumed to reduce the single outstanding balance that all defendants owe. Also, this is not a situation in which several defendants who each caused separate harms are held separately liable, where a payment by one defendant would only reduce her own outstanding balance with no impact on the liability of others. Instead, each HCH defendant has been held liable for a specific sum that may be owed (partially or entirely) by some (but not necessarily all) other HCH defendants.

To complicate matters further, these seventeen defendants were charged in multiple indictments, prosecuted in separate proceedings, and sentenced at different times. The resulting judgments reflect a dizzying array of joint and several obligations that are not all consistent with one another. *See* Appendix 1. For example, Shvets's judgment lists her as jointly liable with Hearn for $253,196, even though Hearn's total restitution debt is only $42,211. *Id.* These inconsistencies have

17

left the parties, the District Court, and the Clerk to sort out after the fact how to apply payments to reduce these various debts.

Unsurprisingly, the parties advance diametrically opposite proposals for how to handle this situation. Shvets insists that every payment by a jointly and severally liable co-defendant must reduce her own debt. By contrast, before the District Court, the Government urged that no payment by a co-defendant should reduce Shvets's debt until all liability associated with HCH ($16.2 million) has been paid off, although it no longer advances that position on appeal. And the Clerk has taken the intermediate view (now with the Government's endorsement) that some but not all co-defendant payments may reduce Shvets's debt, although this has been calculated using a formula that has not been explained.

As noted below, we first conclude that the District Court reasonably understood that Shvets's liability was not fully joint and several with her co-defendants. That is, the District Court was within its discretion to reject Shvets's request for dollar-for-dollar credit for every payment by a listed co-defendant. Instead, as the District Court recognized, Shvets's restitution judgment was part of what has been called a "hybrid scheme" involving all HCH defendants, in which liability is neither fully joint and several nor fully apportioned.

But the determination that Shvets's restitution judgment was part of a hybrid scheme still leaves open the question of how payments should be counted to reduce it. And as explained below, the District Court has a certain amount of discretion to choose a method it deems reasonable under the circumstances.

18

However, on that point, as we discuss more fully below, we conclude the District Court abused its discretion. Rather than choose a reasonable method as to how payments would be counted toward the HCH defendants' various judgments, the District Court applied a blanket rule from *United States v. Sheets*, 814 F.3d 256 (5th Cir. 2016), that Shvets's obligation would only terminate if either: (1) she personally paid $253,196 (i.e., with no credit for co-defendants' payments), or (2) all HCH defendants collectively paid $16.2 million for the entire scheme. Since neither of these conditions was satisfied, her judgment was not satisfied. That approach conflicted with language in Shvets's judgment, which held her liable not for $16.2 million but for a specific $253,196 loss stemming directly from 52 false bills, and indicated that other defendants were jointly and severally liable for that same amount. The District Court needed to determine which payments (or portions of payments) from Shvets's co-defendants should be counted toward Shvets's $253,196 debt, so that it could determine whether her debt had been repaid.

On the present record, we are unable to determine whether Shvets's restitution obligation has been satisfied. While the Clerk has obviously adopted a method for calculating Shvets's outstanding balance as $18,929.69, the facts are not sufficiently developed to understand how that determination was made, nor are we able to ascertain on appeal whether the Clerk's method was reasonable. For these reasons, and as set forth more fully below, we will vacate and remand for the District Court to decide whether the Clerk's system (or an alternative system, if the District Court determines an alternative system would be preferable) is appropriate and fair, and to determine whether, under that system, Shvets's judgment has been satisfied.

19

We will first explore the propriety of the District Court's entry of restitution orders that involve more than the simple imposition of joint and several restitution against more than one defendant for the same debt. For the situation before us is anything but simple and we have not previously opined on what have come to be called "hybrid" restitution orders.

### A. Sentencing Judges May Impose Hybrid Restitution Orders

The Mandatory Victim Restitution Act (MVRA)'s main purpose "is to compensate the victim for its losses and, to the extent possible, to make the victim whole." *Diaz*, 245 F.3d at 312. To achieve that goal, the Act requires district courts to "order . . . that the defendant make restitution to the victim" of various offenses, 18 U.S.C. § 3663A(a)(1), and vests courts "with considerable discretion in fashioning restitution orders," *United States v. Yalincak*, 30 F.4th 115, 122 (2d Cir. 2022).

Under the MVRA, if a "court finds that more than 1 defendant has contributed to the loss of a victim," the statute grants the court two options: it may (1) "make each defendant liable for payment of the full amount of restitution"; or (2) "apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant." 18 U.S.C. § 3664(h). The first option has been understood to refer to what is traditionally called "joint and several liability." *United States v. Wall*, 349 F.3d 18, 26 (1st Cir. 2003). For example, suppose two defendants rob a bank together and steal $10,000. Under § 3664(h)'s first option, the court could impose a $10,000 restitution judgment on each defendant, jointly and severally with the other. In that situation, the victim still may not collect more than $10,000 in total from

the two defendants. *Diaz*, 245 F.3d at 312. Thus, their obligations will terminate if, for example, one defendant has paid $6,000 and the other $4,000 (or one has paid $10,000 and the other nothing). Alternatively, under § 3664(h)'s second option, the court could order one defendant to pay $7,000 and the other to pay $3,000, based on their "level of contribution to the victim's loss and economic circumstances." 18 U.S.C. § 3664(h).

But at least five of our sister courts of appeals have recognized that § 3664(h)'s two options are not mutually exclusive, and that they permit what have been termed "hybrid" restitution orders. *Sheets*, 814 F.3d at 260; *United States v. Salti*, 59 F.4th 1050, 1055–58 (10th Cir. 2023); *Yalincak*, 30 F.4th at 118; *United States v. Trigg*, 119 F.3d 493, 501 (7th Cir. 1997); *United States v. Scott*, 270 F.3d 30, 52–53 (1st Cir. 2001).[2] In a hybrid restitution order, the sentencing

---

[2] The Eighth and D.C. Circuits have yet to weigh in on this issue, but district courts in their respective circuits have discussed hybrid restitution orders. *See United States v. Morris*, No. 17-cr-107, 2023 WL 8437551, at *1 (D. Minn. Dec. 5, 2023) (noting that "under the hybrid approach to restitution, the Court can combine the apportionment of liability approach while concurrently making all the defendants jointly and severally liable, which was done in this case"); *United States v. Eastman*, No. 22-cr-22-1, 2023 WL 6446931, at *10 (D.D.C. Sept. 8, 2023) (noting some courts have found that "a court . . . may apply a 'hybrid approach' by holding the 'most significant offender . . . liable for the full amount of the loss,' while requiring 'lesser participants . . . to contribute lesser amounts'").

21

judge may impose liability that is neither fully joint and several nor fully apportioned, but a combination of the two. To illustrate how that could work, consider the following scenario: Two defendants, A and B, rob a bank together and steal $10,000, and the next day, B alone robs the same bank and steals $7,000. The sentencing judge may feel it is appropriate to hold A and B jointly and severally liable for the $10,000 stolen in the first robbery, while holding B separately liable for the $7,000 stolen in the second robbery. A's total restitution obligation is therefore $10,000 while B's is $17,000. (The total restitution imposed on both is $17,000, not $27,000.) A's and B's restitution debts are not fully joint and several, because $7,000 of B's liability is not shared with A, but they are also not fully apportioned, because $10,000 is owed jointly by the two.

Courts have not merely limited hybrid restitution orders to situations like the above involving separate conduct, but have used them to apportion responsibility for indivisible harms. In *United States v. Salti*, 59 F.4th 1050 (10th Cir. 2023), two defendants, Salti and Towner, perpetrated a single armed robbery in which the victim's loss was $72,000. Towner was ordered to pay the entire $72,000 in restitution, while Salti's judgment recited the total loss of $72,000 but only ordered Salti to pay $35,000 of it. *Id.* at 1052–53. Notably, Salti's judgment did not represent any discrete harm or portion of the

---

In addition to the District Court in this case, at least one other district court in the Third Circuit has approved of hybrid restitution orders. *See United States v. Limper*, No. 19-cr-303, 2023 WL 5401560, at *1 (E.D. Pa. Aug. 22, 2023) (approving a report and recommendation of a hybrid approach for restitution apportionment).

victim's $72,000 loss—there was only one robbery and thus one single, indivisible loss. But the district court exercised its discretion under § 3664(h) to "apportion" $35,000 of that loss to Salti while also making Salti's obligation joint and several with Towner's. That arrangement could, perhaps, have reflected Salti's "level of contribution" or "economic circumstances," permissible considerations under § 3664(h).

We too have previously affirmed a restitution order that employed joint and several liability even though each defendant was not held liable for the same amount. *Diaz*, 245 F.3d at 312. In *Diaz*, a defendant and her co-defendant were each ordered to pay a federal agency $846,000 while two other defendants involved in the scheme were ordered to pay $1,000 in restitution. *Id.* On appeal, the defendant argued that the district court may "have ordered restitution in an amount greater than the actual loss, which it cannot do." *Id.* We affirmed the restitution order, explaining that the district court appeared to have "impose[d] joint and several liability on multiple defendants for restitution, permitting the victim to recover its losses from all or some of the wrongdoers" but directed the District Court to clarify that the defendants' restitution obligations, including those apportioned only a portion of the restitution, "are joint and several." *Id.* Although we did not analyze whether the orders complied with the text of § 3664(h), we implicitly approved holding the defendants jointly and severally liable for different amounts.

We now hold that 18 U.S.C. § 3664(h) allows sentencing judges to issue "hybrid" restitution orders—i.e., orders that combine apportionment with joint and several liability. This flexibility comports with the text of the statute. Under § 3664(h), a "court may make each defendant liable for

23

payment of the full amount of restitution *or* may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant." 18 U.S.C. § 3664(h) (emphasis added). "[T]he word 'or' has an inclusive sense (A or B, or both) as well as an exclusive one (A or B, not both), and is generally used in the inclusive sense." *Rush v. Kijakazi*, 65 F.4th 114, 120 (4th Cir. 2023) (quotation marks omitted); *c.f.* Antonin Scalia, *A Matter of Interpretation* 37–38 (1997) (interpreting "the freedom of speech, or of the press" to "stand as a sort of synecdoche for" all forms of communication). In deciding the appropriate sense, we may look to statutory context. *See Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 87 (2018); *De Sylva v. Ballentine*, 351 U.S. 570, 573–74 (1956) (construing "or" in a list of beneficiaries to allow multiple beneficiaries to exercise their rights simultaneously). The MVRA's statutory context supports reading "or" inclusively in § 3664(h): allowing the sentencing court to combine the two options—apportionment with joint and several liability—effectuates the statute's purpose of making victims whole, *see Diaz*, 245 F.3d at 312, while not overburdening criminal defendants personally with the full scope of the loss. *See United States v. Borino*, 123 F.4th 233, 244 (5th Cir. 2024) (Section 3664(h) allows "courts to 'apply a hybrid approach in imposing restitution—frequently employing a combination of the apportionment of liability approach while concurrently making all of the defendants jointly and severally liable.'"). The flexibility to impose hybrid restitution orders also aligns with the statutory purpose by ensuring all defendants' restitution payments contribute toward the victim's overall recovery but does not allow the Government to "collect more from all defendants together than will make the victim whole." *Sheets*, 814 F.3d at 261; *see also id.* at 262 ("Ensuring that restitution

24

payments from all defendants contribute toward the victim's overall recovery is a simple and uniform means to have victims receive full and timely restitution as provided by law and otherwise ensure that decisions of our district courts align with the purpose of the MVRA." (citation omitted)); *Diaz*, 245 F.3d at 312 (stating a court "cannot order multiple defendants to pay restitution in amounts that will result in the payment to the victim of an amount greater than the victim's loss").

Moreover, although the term "hybrid scheme" is new, the concept that joint and several liability may combine with separate liability is not, as this occurs in tort law when multiple defendants cause the plaintiff related but not identical harms. *See* Restatement (Second) of Judgments § 50, cmt. c, ill. 2 (1982). The Supreme Court has instructed that tort principles may sometimes be informative when interpreting Congress's restitution statutes. *See Paroline v. United States*, 572 U.S. 434, 452 (2014) (using tort law causation principles). Here, the language of § 3664(h), which grants sentencing judges the wide discretion to choose between apportionment and joint and several liability, reflects a congressional intent to preserve the historic flexibility to combine those options.

In sum, § 3664(h) presents sentencing judges with the option to combine apportionment with joint and several liability in a way that is fair to all parties while promoting the MVRA's purpose of compensating victims. Accordingly, we agree with our sister courts to have addressed this issue that the MVRA authorizes the imposition of hybrid restitution orders.

B. The District Court Reasonably
Determined That Shvets's
Restitution Judgment Was a
Hybrid One

We conclude the District Court reasonably interpreted Shvets's judgment as a hybrid one that combines apportionment with joint and several liability.

"In interpreting a sentencing court's statements, we inspect the sentencing transcript as well as the judgment the sentencing court entered. When a sentencing court's oral sentence and its written sentence are in conflict, the oral sentence prevails." *Ruggiano v. Reish*, 307 F.3d 121, 133 (3d Cir. 2002) (citations, alterations, and quotation marks omitted). "When an orally pronounced sentence is ambiguous, however, the judgment and commitment order is evidence which may be used to determine the intended sentence." *United States v. Villano*, 816 F.2d 1448, 1451 (10th Cir. 1987); *accord Ruggiano*, 307 F.3d at 133 (looking to the written judgment to clarify the oral sentence). Moreover, "if the judgment fails to express the rulings in the case with clarity or accuracy, reference may be had to the findings and the entire record for the purpose of determining what was decided." *Richman Bros. Recs. v. U.S. Sprint Commc'ns Co.*, 953 F.2d 1431, 1439 (3d Cir. 1991) (quotation marks omitted). This approach ensures that a judgment is construed "to give effect to the intention of the court." *Id.* (quotation marks omitted).

Shvets's judgment states that she is personally liable for $253,196 and that her liability is joint and several with at least eight other defendants. Those statements make clear that Shvets's liability was not fully apportioned—i.e., Shvets was

26

not the sole defendant liable for all of her $253,196 judgment. But there are also indications that her liability was not purely joint and several, either. The basis for joint and several liability was that other defendants may have "participated in the false Medicare claims" that Shvets helped submit, but that fact alone would not preclude those co-conspirators from potentially owing other, separate debts not shared with Shvets. Appx 166. And indeed, the facts known at sentencing proved as much. Two listed co-defendants who had already been sentenced—Pugman and Kolodesh—had been ordered to pay $16.2 million in restitution each, while another, Hearn, had been ordered to pay just $42,211. It would be mathematically impossible for the liability of Kolodesh, Shvets, and Hearn to be fully joint and several and yet consist of three different amounts. *See United States v. Hunter*, 52 F.3d 489, 494 (3d Cir. 1995) ("[W]e cannot comprehend on this record joint and several liability where the amount of restitution ordered for each defendant is different."). And the fact that Kolodesh's $16.2 million judgment was mentioned at sentencing suggests the District Court intended for the various judgments to be consistent, implying a hybrid approach.[3]

---

[3] We thus disagree with Shvets's argument that treating her judgment as part of a hybrid scheme deprived her of notice and an opportunity to challenge it. Having been made aware of Kolodesh's greater obligation, Shvets could not be surprised that her lesser one was not fully joint and several with his. We are also not certain that notice would have been required anyway, as even in a hybrid scheme, Shvets is not personally liable for more than the $253,196 written in her judgment, and certainly not for Kolodesh's entire $16.2 million. Moreover, the Government, in its prosecutorial discretion, could have declined to pursue any of Shvets's co-defendants for

In reaching this conclusion, we are mindful that Shvets's written judgment contains the words "Joint and Several," and that those words are unqualified. Appx 67. But the words "Joint and Several" do not foreclose that the judgment may in fact be hybrid, since hybrid restitution includes aspects of joint and several liability. *See Salti*, 59 F.4th at 1058–59 ("[J]oint-and-several-liability nomenclature in the restitution context" "conveys that the victim can be fully compensated even if one of those liable is unable to pay that person's assigned share of the liability," not that "any defendant who is made jointly and severally liable can expect that his liability will be reduced through another defendant's contributions."). It would be unreasonable for Shvets to assume that co-defendants with whom she shared *some* liability could not have their own, separate debts resulting from their separate conduct. Moreover, to demand that Shvets's judgment specify in advance how payments would be credited could place an undue, and indeed impractical, burden on sentencing judges. Defendants sentenced at different times in multiple proceedings may have a mix of related and separate restitution debts that are unknown in advance. Thus, the words "Joint and Several" in a judgment are compatible with a hybrid restitution scheme in which some, but not all, of co-defendants' liability is shared.[4]

restitution, making it doubtful Shvets would have a property right to credit for their payments sufficient to trigger due process protections.

[4] Shvets's argument to the contrary rests on *United States v. Broadbent*, 225 F. Supp. 3d 239 (S.D.N.Y. 2016), but that case involved unique judgment language not present here. In *Broadbent*, four defendants were made jointly and severally liable in amounts ranging from $120,000 to over one million

We also note, as the District Court did, that interpreting Shvets's restitution judgment as a hybrid one will never increase the total she must pay beyond the amount set out in it (i.e., $253,196). Thus, the judgment's statement that Shvets owes $253,196 in restitution has been fully complied with, and nothing in the District Court's hybrid interpretation extends Shvets's liability to all $16.2 million owed by the HCH defendants.

Finally, we owe deference to the District Court's interpretation of Shvets's judgment and other defendants' judgments as imposing a hybrid approach. *See Fine Paper Antitrust Litig.*, 695 F.2d at 498. The District Court acted within its discretion in imposing a hybrid restitution as such an

---

dollars. Broadbent's judgment stated that his "'obligation to make restitution shall cease once the aggregate of the restitution paid' by him and the three other defendants 'reaches $120,000.'" *Id.* at 241. Once that happened, the district court concluded that Broadbent's obligation must be deemed satisfied, irrespective of the fact that other harm caused by the conspiracy remained uncompensated. *Id.* at 245. "[T]he plain language of the judgment" compelled that result. *Id.*

*Broadbent* is of limited value here: it turned on unique language that the restitution obligation "shall cease" when a specified event occurred. *Id.* at 241. Shvets's judgment contains no such language: it simply specifies the amount of restitution and states that it is "Joint and Several" with eight other defendants. Appx 67. Nothing in Shvets's judgment implies that it will terminate when the eight listed co-defendants have collectively paid $253,196.

approach reasonably comports with the "language in [the] judgment" and is "fair." *Salti*, 59 F.4th at 1056–57.

### C. District Courts Have Discretion in How to Credit Payments Toward a Set of Hybrid Restitution Orders

Deciding that the MVRA permits "hybrid" restitution orders turns out to be the easier question on this appeal. The harder question is how to count payments by defendants obligated under different hybrid restitution orders (so as to determine when the orders are satisfied). Cases referring to "the" hybrid approach may give the misimpression that there is just one way, or one preferred way, of counting payments toward such judgments. But as we will see, that is not the case. Instead, the district court has wide discretion to apply payments in a way that reasonably comports with "language in [the] judgment[s]" and is "fair." *Salti*, 59 F.4th at 1056–57.

To start, the MVRA itself does not specify how to count restitution payments. (The only statement relevant to payment is that the "amount paid to a victim" must be "reduced" by amounts recovered in civil proceedings. 18 U.S.C. § 3664(j)(2).) Any constraints on the method of counting must therefore come from other sources—such as the MVRA's purpose of compensating victims, the nature of joint and several liability, the text of specific restitution judgments, and the principle, recognized in various cases, that district courts may consider whether a method of counting would be "fair" (both to the victim and the defendants). *Salti*, 59 F.4th at 1056–57.

30

In the case of judgments that are fully joint and several or fully apportioned (i.e., not hybrid), the rules of arithmetic dictate just one method of counting payments. For full joint and several liability, the defendants' obligations are discharged when their combined payments reach the amount of their judgment. And in the case of fully apportioned liability, each defendant's obligation terminates when her own payments total the amount in her judgment, irrespective of any payments by other defendants. Those are the only options for those kinds of judgments.

If hybrid restitution judgments similarly admitted one, self-evident method of determining when they are satisfied, we would likewise be constrained to conclude that that method and only that method must be used. So too if the text of the MVRA or principles of joint and several liability dictated the method of counting. Unfortunately, neither is true. Basic arithmetic inevitably permits multiple, incompatible ways of counting payments toward hybrid restitution orders, and nothing in the statute or background principles provides a single, generally applicable rule for all cases.

The best way to illustrate why is to consider an example. Suppose two defendants, A and B, are held jointly liable for $10,000, while B is separately liable for an additional $7,000. Now suppose each defendant has personally paid $5,000, and the district court is to determine whether A's obligation has been satisfied. The answer depends on how B's payment is counted. If it is counted toward the $10,000 joint debt, that debt would be paid off, and A would have no further liability. But if B's payment goes only toward B's separate debt, A would still owe $5,000 of the joint debt. And if B's payment is split equally between the joint debt and B's separate debt, A would

still owe $2,500 of the joint debt. As a result, the fact that A and B have paid $5,000 each, standing alone, does not tell us whether A's judgment is satisfied.

There is nothing in the text of the MVRA stating that district courts should apply B's payment to one debt or the other, nor are we aware of anything in the common law of joint and several liability that would provide such a rule. It could be argued that the first option—attributing B's payment to the joint debt—should be excluded for undercutting the MVRA's purpose of compensating the victim, since it discharges A's liability based on B's payments, even though B has yet to satisfy his own debt. *See Salti*, 59 F.4th at 1057. We agree that compensating the victim is a paramount concern, and it may therefore be appropriate to insist that B pay his separate debt before the joint debt. *See Yalincak*, 30 F.4th at 129 ("[O]ne of the benefits of the hybrid approach is that it works to ensure *multiple* sources of restitution, up until the point at which the victim is made whole or an individual defendant has satisfied his or her obligation."). But we are not prepared to say that such a principle will dictate a single approach for all cases. *See id.* at 130 n.5 (noting the district court's "considerable discretion" to choose alternative approaches). If the two debts were owed to different victims, for example, insisting that B pay his separate debt first would hurt the victim owed the joint debt. And as the number of defendants and complexity of their overlapping obligations increases, it is not so obvious that there is a single best way to maximize victims' recoveries. We are thus forced to conclude that there is not one, generally applicable rule under the MVRA for how to count payments toward hybrid restitution orders. That gap must be filled by the sentencing court's discretion. *See Salti*, 59 F.4th at 1057 (approving district court's discretion in how it counted

32

restitution payments); *Yalincak*, 30 F.4th at 130 n.5 ("[D]istrict courts are granted considerable discretion by the MVRA to order full restitution by all participants in a crime, to apportion the liability among defendants, to use the hybrid approach as described in this opinion, or to create variant hybrid approaches in order to effectuate the goals of the MVRA in particular cases.").

It appears that, in practice, hybrid restitution payments are frequently counted using software promulgated to district court clerks' offices by the Administrative Office of U.S. Courts (AO), as was done in this case. *See United States v. Bronke*, No. 01-cr-532, 2022 WL 4119784, at *1 (N.D. Ill. Sept. 8, 2022) (noting the widespread use of the software). For the reasons discussed more thoroughly below, we are not in a position to opine on whether or under what circumstances the Clerk's system may be appropriate, but we note that no party to this appeal has argued that the system is inappropriate in theory (despite disagreeing on its application here). Some courts have concluded that the Clerk's system produces unfair results in certain situations and have therefore overridden it. *See Salti*, 59 F.4th at 1053–54 (district court overriding the Clerk's computation that one defendant overpaid); *United States v. Gonzalez*, No. 12-cr-260, 2019 WL 2524840, at *2 (W.D. Tex. June 18, 2019) (expressing "concern" with results produced by the Clerk's system but concluding language of judgment precluded deviating from it). We agree that sentencing judges retain discretion to make that call. But we cannot say that the Clerk's system or another system is preferable in all cases.

Finally, we do not intend for this wide flexibility to place a heavy burden on sentencing judges. Deciding how to

33

count restitution payments will normally be a simple judgment call, requiring neither factual exploration nor extensive argument, and the fact that a defendant may view an alternative system as *more* fair will not be grounds for upsetting the sentencing judge's determination so long as the system used is also within the wide range of fairness. The sentencing judge does not need to choose the best possible system in each case, only a fair system it views as appropriate.

### D. Shvets's Judgment Precludes Application of the Fifth Circuit's Rule in *Sheets*

Although the District Court reasonably determined that Shvets's restitution judgment was part of a hybrid scheme, it did not decide which payments should be credited toward it. Instead, applying a rule from *United States v. Sheets*, 814 F.3d 256 (5th Cir. 2016), it decided that Shvets's judgment would not be satisfied until she had personally paid all of it (irrespective of co-defendants' payments) or Medicare was fully compensated for the broader $16.2 million scheme. We will refer to these two criteria as "*Sheets*'s rule." Since neither criterion was satisfied, the District Court concluded Shvets's judgment was outstanding, without deciding which (if any) payments by Shvets's co-defendants should be credited toward her personal $253,196 debt.

We conclude the District Court's decision to apply *Sheets*'s rule conflicts with the language of Shvets's judgment. To understand how, it helps to review the facts of *Sheets*. There, a number of defendants were convicted of a scheme to submit fraudulent bills to the government. Relevant here, three of those defendants (Sheets, Otto, and Reed) were ordered to pay

as follows: Sheets was ordered to pay restitution for the scheme's entire $972,794.70 loss; Otto was ordered to pay $66,606.48; and Reed was also ordered to pay "the $66,606.48 loss" for the "same conduct" as Otto. *Sheets*, 814 F.3d at 258. After Reed had paid off his $66,606.48 portion, the district court held that Otto's obligation had been discharged "because the amount attributable to Otto and Reed's conduct together is $66,606.48" and thus "Otto and Reed cannot in turn pay more than this amount combined." *Id.* at 261. But the Fifth Circuit reversed and concluded Otto's judgment remained outstanding. *Id.* at 260. The Fifth Circuit apparently considered that letting Otto off the hook entirely based on Reed's payments would be unfair—given that Otto had paid nothing and the victim was still not fully compensated for the broader scheme. *Id.* at 262. To avoid that unfairness, the Fifth Circuit crafted a rule that Otto's judgment could only terminate on either of two conditions: (1) Otto *personally* paid the entire $66,606.48 allocated to him (i.e., without counting payments by co-defendants); or (2) all defendants involved in the scheme collectively paid the scheme's entire $972,794.70 loss. *Id.*

Critically, the Court of Appeals in *Sheets* required Otto and Reed to pay more, combined, than the loss they were collectively ordered to repay. *Id.* Their payments in excess of $66,606.48 would go toward repaying liability imposed *solely* on Sheets. And under the second part of the rule, even if each paid $33,303.24 toward their shared $66,606.48 liability, the Fifth Circuit's rule would presumably have them keep paying so long as Sheets's separate liability remained unsatisfied.[5]

---

[5] *Sheets* indicated that concern for Otto and Reed paying more than the loss for which they were sentenced would be

We would not foreclose that, under appropriate circumstances, a sentencing judge could order restitution in such a way that *Sheets*'s rule would apply. For example, if Otto and Reed were culpably involved in the entire fraud, but the sentencing judge felt, for whatever reason, that they should pay less than the entire scheme's loss, it might make sense to hold each liable for a $972,794.70 total loss while capping their payments at $66,606.48 each. Under that interpretation, the $66,606.48 cap would not represent any specific loss, and Otto and Reed would not owe the "same" $66,606.48 debt; payment by one would not affect the liability of the other. The facts of *Salti* might present another scenario where ordering *Sheets*-like restitution would make sense, in that multiple defendants perpetrated a single robbery with a single loss but were nonetheless ordered to repay different amounts of it.

But setting aside whether and under what circumstances a sentencing judge may order restitution so as to follow *Sheets*'s rule, a judgment that has already been issued must be complied with and, if incompatible with *Sheets*'s rule, will preclude application of it. When we say restitution payments from multiple defendants may not exceed the victim's "loss," *Diaz*, 245 F.3d at 312, it is important to understand *which* "loss" we are talking about. *Sheets*'s rule conceives of the victim's loss as being the entire loss from a broader scheme, irrespective of the liability imposed on any one participant. (That is, only payment of the *entire* scheme, not any subset of it, will be considered full compensation.) For some restitution judgments, that may be true. However, it is clear that if a defendant's restitution judgment is based on a more limited

---

"misplaced," 814 F.3d at 262, although the precise reasoning on that point is unclear to us.

loss, it is that more limited loss that needs to be considered in determining whether the victim has been made whole. That is, after all, the only amount for which compensation has been ordered.

Here, it is clear that Shvets's restitution judgment was based on a specific $253,196 loss stemming from 52 false bills, and that she was not ordered to pay restitution for any broader conduct or scheme. At sentencing, the District Court pronounced that Shvets "shall make restitution in the amount of $253,186 [sic] jointly and severally with" several co-defendants, and that "[t]he amount ordered represents as aforesaid, the total amount due to the victim of this loss." Appx 184–85.[6] In so doing, the District Court adopted the Government's recommendation that Shvets pay $253,196 in restitution for her role in helping to submit 52 false bills. It also followed the Government's suggestion that Shvets be held jointly and severally liable with "all of the other co-conspirators that participated in the false Medicare claims that involved those 52 cases," as opposed to all who participated in the broader fraud. Appx 166. The written judgment similarly identified Shvets's restitution liability and "Total Loss" as $253,196. Appx 66. Together, these statements show that the loss underlying Shvets's judgment consisted of $253,196 for those 52 false bills, not other parts of HCH's broader scheme. Thus, payments by co-defendants who contributed to the same loss may count toward the point at which the victim is fully compensated for that specific loss.

---

[6] Later in its oral pronouncement, the District Court corrected this figure to $253,196.

Although the foregoing language appears clear on its own, our interpretation is buttressed by the fact that no effort was made at sentencing to pin down the broader scheme Shvets should be held responsible for. Without identifying the scheme, *Sheets*'s rule cannot even be stated, since it cannot be said whether the victim has been made whole for the entire scheme's loss. Neither the sentencing transcript nor the written judgment choose, for example, between the broader $16.2 million scheme and the $1.56 million "continuous care" scheme, and all indication is that Shvets's liability was attributed just to 52 false bills. This omission reinforces our conclusion that Shvets's liability is limited to repaying a specific $253,196 loss rather than a broader scheme.[7]

We are also not convinced that fairness concerns, to the extent any could be said to favor *Sheets*'s rule, are strong enough to overcome the clear import of the judgment. The Fifth Circuit was evidently swayed by the unfairness of letting Otto pay nothing while having his debt discharged by Reed's money, all while the victim was still uncompensated for conduct by Sheets. Here, the payment plans ordered by the District Court (such as the order that Shvets pay at least $100 each month) prevent that situation. While there is always some risk of unequal treatment when defendants are held jointly and severally liable, the defendants here are not free to sit back and wait for their co-defendants to pay their debts.[8]

---

[7] We note, however, that if Medicare recovers the full $16.2 million loss, then Shvets would be absolved of her restitution obligation because her obligation is a portion of the entire $16.2 million loss.

[8] At the hearing before the District Court, there was a dispute as to whether Shvets was complying with her payment

Nor is our interpretation altered by those cases that have repeated *Sheets*'s rule in the context of other hybrid restitution orders, as we do not read them to endorse *Sheets*'s unique feature of making some defendants pay for liability imposed solely on others. *See Yalincak*, 30 F.4th at 126; *Salti*, 59 F.4th at 1056. Instead, those cases involved crediting between just two defendants (where *Sheets*'s peculiar scenario could not arise), and appear to stand for the more modest proposition that it may be preferable to count payments toward separate debts before joint debts (to the same victim) so as to maximize available sources for victim recovery. *See Yalincak*, 30 F.4th at 120 ("That would be achieved by, in effect, crediting [one defendant's] payments first against the portion of the restitution award owed solely by [himself], and only thereafter against the 'joint and several' portion of the total restitution.").[9] So we do not, as the District Court appeared to do, read those cases as making *Sheets*'s rule a default or preferred approach in all cases of hybrid restitution.

Finally, it is telling that while the Government's briefs to the District Court endorsed *Sheets*'s rule, the Government's brief on appeal does not, instead endorsing the Clerk's system. Notably, Defendant Hearn already had his judgment satisfied

---

plan. That is something the Government may need to look into, but it does not change the interpretation of her judgment, which is the only issue before us today.

[9] For two defendants and one victim, *Sheets*'s rule works the same as counting payments toward separate debts before joint debts. *See Yalincak*, 30 F.4th at 120. That is not always so with three or more defendants (as here) or more than one victim.

under the Clerk's system, applying some payments made by others, and there is no indication the Government intends to require Hearn to keep paying by application of *Sheets*'s rule. The Government's position confirms our belief that it was never the District Court's intent that defendants who contributed only to the 52 false bills underlying Shvets's judgment should repay Medicare for other parts of HCH's fraud.

For these reasons, while the District Court correctly determined that Shvets's restitution judgment was a "hybrid" one combining apportionment with joint and several liability, it was erroneous to apply *Sheets*'s rule to it. On remand, the District Court needs to decide how payments by HCH defendants will be counted toward their judgments, using a method it deems reasonable and compatible with the language of the judgments. Based on that determination, it should assess whether Shvets's restitution judgment remains outstanding.

### E. We Are Unable to Determine Whether Shvets's Restitution Judgment Is Satisfied

We are not able to determine whether Shvets's restitution judgment has been satisfied. The District Court has not addressed whether the Clerk's methodology for counting payments is appropriate, or whether the payments were reasonably applied in this case.

Shvets's restitution judgment is part of a scheme and, since there are multiple ways of counting payments toward a hybrid scheme, the District Court needed to determine which method would be used, so that it could ascertain whether

Shvets's judgment might be satisfied. Even if Shvets's restitution balance would be outstanding under any reasonable system, there would still be an advantage in deciding how payment should be counted so that the HCH defendants could "know, as they lead their lives and make economic decisions over the long duration of restitution orders, the extent of their remaining restitution obligations." *Yalincak*, 30 F.4th at 130. For these reasons, we conclude the District Court erred by not deciding how restitution payments should be counted.

Even if we assume the Clerk's method would be selected, the record does not adequately explain how the Clerk has been accounting for restitution payments, and we therefore cannot tell whether the Clerk's conclusion that Shvets still owes $18,929.69 follows from a method that is reasonable and fair. Tentatively, we can say that some aspects of the Clerk's system do appear reasonable. The Clerk's system recognizes that some type of crediting is needed among payments on joint debts to prevent overpayment. It also recognizes that not all related debts are necessarily joint. So, for example, Pugman shares some debt with Shvets but also owes separate debt, and Shvets does not necessarily receive credit for payments on Pugman's separate debt.

But many details are missing. We do not know how the Clerk arrived at fifteen buckets, the amounts of those buckets, or the assignment of defendants to buckets. Take Roytenberg, Koltman, and Novikov, for example. All were ordered to pay restitution in the amount of $405,184, but the Clerk seems to have determined that Roytenberg and Novikov were assigned to buckets B, K, L, M, and N, while Koltman was assigned to B, H, K, and L (assuming we understand the Clerk's documentation, which we are not certain we do). The result

41

would appear to be that Novikov receives 100% credit for every payment by Roytenberg but less for payments by Koltman. There is nothing in the record that would explain this difference in treatment.

We also agree with Amicus that there is no obvious way to start with the texts of the judgments (or other information in the record) and arrive at the Clerk's assignment of defendants to buckets.[10] While the Government points out that the judgments do place some constraints on the buckets (for example, once it is known that Hearn is assigned to bucket A and Shusterman to buckets A and B, the value of bucket B may be calculated as the difference between their judgments), it is not obvious how this explains why the defendants are assigned to the buckets they are. Thus, the Government's observation, assuming it is accurate, does not help us understand the Clerk's system.

We also are unsure if the record precisely describes how the Clerk allocated payments among buckets. There are no examples of how individual payments were allocated, and the parties disagree as to whether Shvets received the correct share.

We disagree with the Government that Shvets failed to preserve an objection to the Clerk's system. Shvets maintained throughout that the Clerk's system should have given her a greater percentage of payments by Pugman and Kolodesh. She also objected that the information the Government had supplied on the Clerk's system was "[i]ncomprehensible."

---

[10] The Clerk's assignment of defendants to buckets is in Appendix 2.

D.C. ECF No. 492 at 12. Moreover, the Government appears to have divulged that information incrementally over the course of several briefs and hearings, meaning Shvets did not have a complete picture from which she could formulate a coherent objection (other than to point out, as she did, that the information was incomplete). Notably, the issue of fluctuating bucket balances (which allegedly explains why Shvets's proportional credit was less than she believed it should have been) was not brought up until after the District Court's second hearing.

We will therefore remand for the District Court to ascertain how the Clerk has been accounting for restitution payments made by the various defendants and whether Shvets's restitution balance remains unsatisfied.

Although we have focused on the language of Shvets's judgment, we do not mean to imply that the District Court (and by extension the Clerk) is limited to the texts of the judgments in deciding how to apply payments. The Government stated at sentencing that there would be jointly liable defendants beyond those listed in the judgment, and prescribing ahead of time how payments on joint debts will be credited could be difficult or impossible where multiple defendants are held responsible for different amounts at different times. Thus, it is unsurprising that the texts of the judgments contain only lists of names, often inconsistent with each other, without specifying amounts of shared and separate liability. This may not be enough information to determine which payments apply to which debts. Analogously, courts applying joint and several liability in the civil context have looked beyond the judgments themselves in deciding how to credit joint payments. *BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 517 F.3d 1271, 1279 (11th

Cir. 2008) (looking to pleadings); *Cimino*, 501 P.2d at 452–53 (looking to the trial record).

Since we do not fully understand the Clerk's system, we will not dictate precisely what information the District Court needs to ascertain on remand. The District Court should obtain the information that it determines, in its discretion, is necessary for it to make an informed decision as to whether the Clerk's allocation methodology was appropriate and fair and whether, under an appropriate methodology, Shvets's restitution judgment has been satisfied, in accordance with the principles we articulate today.

IV.Collection Issues

We address Shvets's remaining arguments regarding how the Government has accounted for money and property it collected (or failed to collect or recover) from her co-defendants. We conclude that these arguments lack merit.

A. Bank Accounts and Real Estate

Shvets argues she should receive additional restitution credit for bank accounts and real estate associated with co-defendants Pugman and Kolodesh.

Before delving into the specific assets at issue, we discuss the general nature of Shvets's objection. Shvets accuses the Government of abandoning property that could have been used to pay restitution, and she urges that the value of this property should be credited as if it had actually been collected. For this proposition, she advances two theories. First, she reasons that the Government's decision to forego collection is

akin to a settlement with the property's owner. Under a civil maritime rule that Shvets asks us to extend to the criminal restitution context, a settlement with one jointly liable defendant acts as a credit to other defendants in the amount of the settling defendant's share of liability, irrespective of the amount actually paid. *See McDermott, Inc. v. AmClyde*, 511 U.S. 202, 208–09 (1994). Second, Shvets, along with court-appointed Amicus Curiae, posits that the Government's failure to recover property breaks the causal chain between her own misconduct and Medicare's loss, such that the Government should bear the shortfall.

We conclude Shvets is not entitled to a credit for money the Government did not actually collect. As to Shvets's first theory, failing to collect money is not analogous to a settlement. A settlement releases the defendant from liability and precludes the possibility of future payments. By contrast, if the Government merely failed to collect a $2.5 million payment from Pugman (as Shvets alleges), Pugman would still be liable for the full amount of his restitution balance and the Government could keep collecting it from him going forward. Since Pugman and Kolodesh were not released from their restitution obligations, we do not consider what result would follow if they were.

As for Shvets's second theory, we see no merit to the proposition that the Government's negligent failure to collect assets could break the causal chain between Shvets's criminal conduct and Medicare's loss. The amount of loss Shvets caused has been determined to be $253,196, and Shvets has not asked for that final judgment to be reconsidered. Furthermore, providing a restitution credit for amounts not actually collected would conflict with 18 U.S.C. § 3664(j)(2), which limits

criminal restitution credit for civil recoveries to the amount "recovered." *See United States v. Bright*, 353 F.3d 1114, 1123 (9th Cir. 2004) ("[T]he MVRA provisions . . . make clear that funds the victims have not received cannot reduce or offset the amount of losses the defendant is required to repay." (emphasis omitted)); *United States v. Martinez*, 610 F.3d 1216, 1232 (10th Cir. 2010) (same). While some of the collections at issue here were through criminal rather than civil processes, we see no reason why Congress would have wanted to treat the two differently.

Since we have concluded that Shvets is only entitled to credit for money actually collected, the remaining issue is whether the Government failed to account for any such collections. That requires us to discuss the burden of proof, which the parties dispute. The restitution statute specifies that the burden of proving loss rests with the Government, the burden of proving financial circumstances rests with the defendant, and the burden of proving "other matters" may be allocated "as justice requires." 18 U.S.C. § 3664(e). Factors to consider in allocating a burden under § 3664(e) include which party "has an affirmative goal" in proving a fact and which party has "presumptive access to proof." *United States v. Smathers*, 879 F.3d 453, 460 (2d Cir. 2018). Courts, including this one, have tended to place the burden of contesting restitution payments on the defendant. *United States v. Bryant*, 655 F.3d 232, 254 (3d Cir. 2011); *United States v. Parker*, 927 F.3d 374, 382 (5th Cir. 2019); *United States v. Sizemore*, 850 F.3d 821, 828 (6th Cir. 2017); *Smathers*, 879 F.3d at 461. But such cases have mostly involved disputes over the defendant's *own* payments, which "the defendant should know." *Bryant*, 655 F.3d at 254. We have not addressed who bears the burden

when a defendant is disputing amounts the Government may have collected from a third party.

As for the initial burden of production, we need not decide that issue, because the District Court ordered the Government to account for all restitution payments and the Government complied. Thus, assuming the Government bore an initial burden of production, the Government met it. At that point, we hold it was Shvets's burden to show there were additional payments not on the accounting. To require otherwise would put the Government to the impossible task of disproving every other potential source of recovery. While we recognize that the Government may have superior access to information about restitution payments, the District Court addressed that concern by conducting an extensive inquiry and two hearings. It was well within the District Court's discretion not to require more details about assets belonging to Pugman and Kolodesh. *See United States v. Washington*, 869 F.3d 193, 213 (3d Cir. 2017) ("[D]iscovery rulings are ordinarily reviewed for abuse of discretion . . . .").

With those principles in mind, we turn to the specific items of property that Shvets claims entitle her to additional restitution credit.

### 1. Bank Accounts

The Government initially obtained an injunction freezing certain bank accounts, some of which do not appear on the Government's accounting of restitution collected. The Government represented to the District Court that it "did not list these accounts on its summary . . . because it did not recover any funds from these accounts as they either were

released from the civil restraining order or closed prior to 2017." Appx 413–14. Although the District Court did not specifically discuss these bank accounts, it concluded generally it was "satisfied that the government has adequately reported all it has recovered toward restitution in this matter." *Novikov*, 624 F. Supp. 3d at 555.

The District Court's conclusion is a factual one that we review for clear error. *Doe*, 810 F.3d at 142. Since Shvets pointed to no evidence that the bank accounts in question had positive balances when they were turned over to the Government in 2017, the District Court's conclusion was not clearly erroneous. We need not consider Shvets's argument that she should receive a credit for any amounts that were received but later returned to Pugman, since there is no evidence that this occurred.

## 2. Real Estate

Shvets points to various real properties she says the Government should have seized to satisfy restitution. For the most part, Shvets does not claim the Government actually received any money in connection with these properties, only that it should have. For the reasons explained previously, a mere failure to collect property does not entitle Shvets to a credit.

Shvets does suggest that the Government acquired and then abandoned a statutory lien on some of Pugman's properties. The Government responds that it did not have a lien because the properties were owned by business entities, not any of the defendants, and the lien provided by 18 U.S.C.

48

§ 3613(c) only extends to "property and rights to property of the person fined." Factually, Shvets does not dispute this point.

Even assuming merely obtaining a lien could count as receiving property (an issue we need not reach), Shvets has not shown that there was in fact a lien. Shvets is therefore not entitled to any additional credit for Pugman's real properties.

## B. Cahaba Subpoena

Shvets urges that the District Court should have enforced her subpoena to Cahaba so that she could obtain information about additional payments Medicare may have received. The Government takes no position on that issue.

We conclude Shvets is not entitled to relief because her subpoena was not served properly and her motion to enforce it was not served on Cahaba at all. Shvets served her subpoena by mail, whereas the rules require personal service. Fed R. Crim. P. 17(d); Fed R. Civ. P. 45(b)(1); *In re LeFande*, 919 F.3d 554, 562–63 (D.C. Cir. 2019). While that defect could be viewed as merely technical (an issue we need not address), failure to serve the motion was not, as it deprived Cahaba of an opportunity to respond to Shvets's arguments about why the information sought was discoverable. *See* Fed. R. Crim. P. 49(a)(1) (requiring service of written motions on "every party"); *Doctor's Assocs. v. Reinert & Duree, P.C.*, 191 F.3d 297, 302 (2d Cir. 1999) ("A court ordinarily does not have power to issue an order against a person who is not a party and over whom it has not acquired in personam jurisdiction."). For this reason, the District Court was correct not to order an unserved party to comply with a subpoena.

## C. *Qui Tam* Relator Payments

Finally, Shvets has not shown she is entitled to additional credit for amounts paid to *qui tam* relators.

This particular dispute concerns only the crediting (or lack thereof) of funds acquired through asset forfeiture under 18 U.S.C. § 982. There is no issue as to the monetary portion of Kolodesh's settlement, which was fully credited toward restitution. The only deduction was from proceeds of Kolodesh's forfeited real properties, where relator payments (among other expenses) were taken out before the balance was turned over to Medicare. Thus, the only question before us is whether a defendant is entitled to a restitution credit for forfeited property that is not used to compensate the victim but used for another purpose, such as paying a *qui tam* relator.

We conclude that no restitution credit is due. The MVRA states that restitution is "in addition to . . . any other penalty authorized by law." 18 U.S.C. § 3663A(a)(1). Criminal forfeiture, which we have described as a "punishment for the underlying crime," *United States v. Sandini*, 816 F.2d 869, 873 (3d Cir. 1987), plainly fits this category, meaning a district court may impose both restitution and forfeiture for the same offense, *United States v. Joseph*, 743 F.3d 1350, 1353–54 (11th Cir. 2014); *United States v. Mei Juan Zhang*, 789 F.3d 214, 217 (1st Cir. 2015); *see also United States v. Various Computs. & Comput. Equip.*, 82 F.3d 582, 588–89 (3d Cir. 1996) (holding there is no double jeopardy issue with imposing both restitution and forfeiture for the same stolen property). If the forfeited property were subsequently given to the victim as compensation, a question might arise as to whether the defendant would be entitled to a restitution credit for that amount—but that is not the issue presented here. The present

50

dispute only concerns property paid to *qui tam* relators, and, as to that property, there is no "amount later recovered . . . by the victim" as would be required for a credit under 18 U.S.C. § 3664(j)(2), and no risk of overcompensation. Accordingly, no credit is due.

Shvets argues it was unlawful for the Government to pay relators out of forfeiture proceeds. We doubt very much that this was unlawful, as the Government has wide discretion to dispose of forfeited property, including by "award[ing] compensation to persons providing information resulting in forfeiture under" the forfeiture statute. 21 U.S.C. § 853(i)(3); *see also* 18 U.S.C. § 982(b)(1) (making 21 U.S.C. § 853 applicable to all criminal forfeitures); *United States ex. rel. Rushing v. Lick*, No. 20-cv-210, 2024 U.S. Dist. LEXIS 7599, at *16 (N.D. Miss. Jan. 16, 2024) (allowing forfeited property to be shared with a relator). Shvets's cited authority speaks to other issues. *See United States v. Wegeler*, 941 F.3d 665, 675 (3d Cir. 2019) (requiring a relator to seek payment in her own False Claims Act lawsuit rather than by intervention in a criminal case); *Willis Mgmt. (Vt.), Ltd. v. United States*, 652 F.3d 236, 244–45 (2d Cir. 2011) (discussing third-party interests in forfeited property under 21 U.S.C. § 853(n)); *United States v. Holy Land Found. for Relief & Dev.*, 722 F.3d 677, 684–85 (5th Cir. 2013) (same). In any event, we fail to see how a payment that did not compensate the victim, even if improperly made, would entitle a defendant to a restitution credit.

Shvets also argues that Kolodesh's forfeited property *indirectly* inured to Medicare's benefit because the proceeds helped satisfy Medicare's own obligation, under the False Claims Act, to make an incentive payment to the relators. We

do not decide whether such an indirect benefit might, under some circumstances, count as a payment for which a defendant should receive credit, because the facts do not support Shvets's characterization. Shvets does not dispute that the Government had a bona fide $16.2 million criminal forfeiture order against Kolodesh and that his real properties were properly forfeited to satisfy it. Once those payments were received, it was up to the Government's discretion, not Medicare's obligation, how to dispose of them. 21 U.S.C. § 853(i). Moreover, Kolodesh's settlement simply provided for the relators to receive a uniform 22% of all cash value collected, whether as direct cash payments or proceeds from selling forfeited properties, which does not suggest that forfeiture proceeds were used to offset an obligation Medicare otherwise incurred to pay the relators.

For these reasons, Shvets is not entitled to a credit for amounts paid to *qui tam* relators.[11]

## V. Conclusion

For the foregoing reasons, we will affirm in part, vacate in part, and remand for a determination as to whether payments have been properly credited and whether Shvets's restitution judgment has been satisfied.

---

[11] Shvets, in her reply brief, argues that some payments the Clerk attributed to Pugman should be reallocated to Ganetsky (possibly altering the proportional credit) because Pugman and Ganetsky's civil settlement provided for the satisfaction of Ganetsky's restitution debt. But because this argument was not raised in Shvets's opening brief, we do not address it. *Rinaldi v. United States*, 904 F.3d 257, 263 n.6 (3d Cir. 2018).

Appendix 1: Restitution Amounts with Joint and Several Lists

| Defendant | Case No. | Restitution ordered | Joint and several defendants |
|---|---|---|---|
| Kolodesh | 11-CR-464-01 | $16,200,000.00 | Pugman, Ganetsky, Novikov, Roytenberg, Koltman, Wiley, Shvets, Koptyakov, Oqroshidze, Goltman, Hearn |
| Pugman | 09-CR-651-01 | $16,200,000.00 | Kolodesh, Ganetsky, Novikov, Roytenberg, Koltman, Wiley, Shvets, Koptvakov, Oqroshidze, Goltman, Hearn |
| Ganetskv | 09-CR-652-01 | $405,184.00 | Kolodesh, Pugman, Novikov, Rovtenberg, Koltman |
| Rovtenberg | 11-CR-084-01 | $405,184.00 | Kolodesh, Pugman, Ganetsky, Novikov, Koltman |
| Koltman | 11-CR-182-01 | $405,184.00 | Kolodesh, Pugman, Ganetskv, Novikov, Rovtenberg |
| Novikov | 11-CR-189-01 | $405,184.00 | Pugman, Ganetskv, Kolodesh, Koltman, Rovtenberg |
| Slipchenko | 11-CR-298-01 | $296,900.00 | Pugman, Ganetsky, Kolodesh, Novikov, Gorovits, McGill, Shvets, Oqroshidze, Goltman, Bagdasarova, Koptyakov, Roytenberg, Koltman, Hearn, Galperin, Wiley, Yakhnis, Zlatkovskiy, Goldman, Shusterman |
| Wiley | 11-CR-322-01 | $258,000.00 | Kolodesh, Pugman, Koptyakov, Oqroshidze, Shvets, Hearn, Goltman |
| Shvets | 12-CR-112-02 | $253,196.00 | Kolodesh, Pugman, Wiley, Oqroshidze, Hearn, Koptyakov, Goltman, Koltman |
| McGill | 12-CR-112-01 | $230,713.38 | Kolodesh, Pugman, Ganetsky, Shvets, Oqroshidze, Goltman, Koptvakov |
| Koptyakov | 12-CR-112-05 | $215,517.00 | Pugman, Kolodesh, Wiley, Oqroshidze, Yakhnis, Bagdasarova, Goltman, Hearn, Shvets |
| Goltman | 12-CR-112-04 | $195,583.00 | Kolodesh, Pugman, Hearn, Shvets, Yakhnis, Bagdasarova, Oqroshidze |
| Oqroshidze | 12-CR-112-03 | $189,907.00 | Kolodesh, Pugman, Koptyakov, Shvets, Goltman, Wiley |
| Bagdasarova | 11-CR-638-01 | $156,213.00 | [sealed judgment] |
| Yakhnis | 11-CR-362-01 | $121,567.00 | Pugman, Kolodesh, Goltman, Heam, Oqroshidze, Koptyakov, Shvets, Bagdasarova, Wiley |
| Shusterman | 11-CR-399-01 | $118,880.00 | Pugman, Ganetsky, Kolodesh, Novikov, McGill, Shvets, Oqroshidze, Goltman, Bagdasarova, Koptyakov, Roytenberg, Koltman, Hearn, Galperin, Wiley, Yakhnis, Zlatkovskiy, Goldman, Slipchenko |
| Hearn | 11-CR-297-01 | $42,211.00 | Pugman, Kolodesh, Goltman, Shvets, Koptvakov |

Amicus Br. 10.

# Appendix 2: Clerk's Table of Restitution Balances

**United States v. Pugman, Kolodesh, et al.**
**Summary of Defendants' Direct Restitution Payments**
**Includes Civil Settlements** | $12,286,480.55

| | | | 0.3% | 0.5% | 0.0% | 0.4% | 0.0% | 0.0% | 0.1% | 0.2% | 0.0% | 0.2% | 0.1% | 1.7% | 0.1% | 0.2% | 96.2% | 100.0% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **A** | Restitution per J&S Account | | $42,211.00 | $76,669.00 | $2,687.00 | $68,340.00 | $5,676.00 | $2,841.00 | $17,093.00 | $37,679.00 | $4,804.00 | $25,256.38 | $13,643.62 | $277,192.38 | $12,422.62 | $ 25,256.38 | $15,588,228.62 | $16,200,000.00 |
| | | | | | | | | | Joint & Several Account Number: | | | | | | | | | |
| Ref No. | Defendant | Restitution Ordered | DPAE211CR000464-A | DPAE211CR000464-B | DPAE211CR000464-C | DPAE211CR000464-D | DPAE211CR000464-E | DPAE211CR000464-F | DPAE211CR000464-G | DPAE211CR000464-H | DPAE211CR000464-I | DPAE211CR000464-J | DPAE211CR000464-K | DPAE211CR000464-L | DPAE211CR000464-M | DPAE211CR000464-N | DPAE211CR000464-O | Totals |
| 1 | Alex Pugman | $16,200,000.00 | $716.35 | $7,140.97 | $357.43 | $11,973.94 | $1,081.19 | $564.79 | $3,807.50 | $8,050.40 | $1,137.18 | $6,160.83 | $2,887.48 | $59,431.99 | $2,823.27 | $5,740.24 | $3,888,676.80 | $4,000,550.35 |
| 2 | Patricia Mcgill | $230,713.38 | - | 1,055.29 | - | 940.45 | 78.11 | - | 235.03 | 518.71 | - | 347.41 | - | - | - | - | - | 3,175.00 |
| 3 | Eugenia Roytenberg | $405,184.00 | - | 3,055.97 | - | - | - | - | - | - | - | - | 543.84 | 11,048.47 | 495.08 | 1,006.64 | - | 16,150.00 |
| 4 | Diana Koltman | $405,184.00 | - | 4,134.49 | - | - | - | - | - | 2,031.82 | - | - | 735.76 | 14,947.93 | - | - | - | 21,850.00 |
| 5 | Lioudmila Novikov | $405,184.00 | - | 4,704.64 | - | - | - | - | - | - | - | - | 837.21 | 17,010.00 | 762.36 | 1,549.86 | - | 24,864.07 |
| 6 | Edward Hearn | $42,211.00 | 25,897.91 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 25,897.91 |
| 7 | Inga Slipchenko | $296,900.00 | 487.01 | 884.37 | 31.10 | 788.42 | 65.44 | 32.85 | 197.25 | 434.64 | 55.46 | 291.42 | 157.04 | - | - | - | - | 3,425.00 |
| 8 | Cecelia Wiley | $258,000.00 | 1,644.55 | 3,625.96 | 127.04 | 3,232.00 | 268.50 | 134.25 | 808.46 | 1,782.13 | 227.11 | - | - | - | - | - | - | 11,850.00 |
| 9 | Anna Yakhnis | $121,567.00 | 7,934.06 | 14,410.89 | 505.05 | - | - | - | - | - | - | - | - | - | - | - | - | 22,850.00 |
| 10 | Zoya Shusterman | $118,880.00 | 284.01 | 515.99 | - | - | - | - | - | - | - | - | - | - | - | - | - | 800.00 |
| 11 | Matthew Kolodesh | $16,200,000.00 | 15.05 | 15,095.61 | 783.67 | 26,771.86 | 2,429.45 | 1,272.02 | 8,625.46 | 18,200.01 | 2,583.68 | 14,014.65 | 6,524.96 | 134,384.39 | 6,402.19 | 13,016.08 | 8,865,514.79 | 9,115,633.87 |
| 12 | Angelica Bagdasarov | $156,213.00 | - | 8,941.04 | 313.35 | 7,969.82 | 661.76 | 331.38 | - | - | - | - | - | - | - | - | - | 18,217.35 |
| 13 | Svetlana Ganetsky | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 14 | Natalya Shvets | $253,196.00 | 1,265.67 | 2,298.85 | 80.57 | 2,049.13 | 170.18 | 85.19 | 512.54 | 1,129.75 | - | - | - | - | - | - | - | 7,591.88 |
| 15 | Giorgi Oqroshidze | $189,907.00 | 2,511.76 | 5,184.89 | 181.57 | 4,621.78 | - | - | - | - | - | - | - | - | - | - | - | 12,500.00 |
| 16 | Yevgeniya Goltman | $195,583.00 | 852.46 | 1,848.29 | 64.92 | 1,647.54 | 136.79 | - | - | - | - | - | - | - | - | - | - | 4,550.00 |
| 17 | Alexander Koptyakov | $215,517.00 | 602.17 | 1,359.45 | 47.59 | 1,211.55 | 100.77 | 50.40 | 303.07 | - | - | - | - | - | - | - | - | 3,675.00 |
| **B** | **Totals** | | **$42,211.00** | **$74,256.70** | **$2,492.29** | **$61,206.49** | **$4,992.19** | **$2,470.88** | **$14,489.31** | **$32,147.46** | **$4,003.43** | **$20,814.31** | **$11,686.29** | **$236,822.78** | **$10,482.90** | **$21,312.82** | **$12,754,191.59** | **$13,293,580.43** |
| **C** | **J&S Account Balance (A less B)** | | **$ -** | **$2,412.30** | **$194.71** | **$7,133.51** | **$683.81** | **$370.12** | **$2,603.69** | **$5,531.54** | **$800.57** | **$4,442.07** | **$1,957.33** | **$40,369.60** | **$1,939.72** | **$3,943.56** | **$2,834,037.03** | **$2,906,419.57** |